**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WATER WHEEL CAMP RECREATIONAL
AREA, INC. and ROBERT JOHNSON,
      *Plaintiffs-Appellees,*

v.

GARY LARANCE, The Honorable
Judge in his capacity as the Chief
and Presiding Judge of the
Colorado River Indian Tribes
Tribal Court, JOLENE MARSHALL,
      *Defendants-Appellants.*

No. 09-17349
D.C. No.
2:08-CV-00474-
DGC

WATER WHEEL CAMP RECREATIONAL
AREA, INC. and ROBERT JOHNSON,
      *Plaintiffs-Appellants,*

v.

GARY LARANCE, The Honorable
Judge in his capacity as the Chief
and Presiding Judge of the
Colorado River Indian Tribes
Tribal Court, JOLENE MARSHALL,
      *Defendants-Appellees.*

No. 09-17357
D.C. No.
2:08-CV-00474-
DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
February 17, 2011—San Francisco, California

Filed June 10, 2011

8021

Before: Richard C. Tallman and Consuelo M. Callahan, Circuit Judges, and Suzanne B. Conlon,* District Judge.

Per Curiam Opinion

---

*The Honorable Suzanne B. Conlon, United States District Judge for the Northern District of Illinois, sitting by designation.

## COUNSEL

Tim Vollmann and Gwenellen P. Janov (argued), Albuquerque, New Mexico, for defendants-appellants The Honorable Gary LaRance and Jolene Marshall.

Dennis J. Whittlesey (argued), Dickinson Wright PLLC, Washington D.C., for plaintiff-cross-appellant Water Wheel Camp Recreational Area, Inc., and plaintiff-appellee Robert Johnson.

Ellison Folk and Winter King, Shute, Mihaly & Weinberger LLP, San Francisco, California; Eric Shepard, Office of the Attorney General, Parker, Arizona, for amicus curiae Colorado River Indian Tribes.

Carl Bryant Rogers, VanAmberg, Rogers, Yepa, Abeita & Gomez, LLP, Santa Fe, New Mexico; Melody L. McCoy, Native American Rights Fund, Boulder, Colorado, for amicus curiae The National American Indian Court Judges Association.

John L. Smeltzer (argued), Environment & Natural Resources Division, United States Department of Justice, Washington D.C., for amicus curiae United States.

Rob Roy Smith, Ater Wynne LLP, Seattle, Washington, for amicus curiae Nez Perce Tribe, Stillaguamish Tribe of Indians, Confederated Salish and Kootenai Tribes of the Flathead Reservation, Confederated Tribes of the Siletz Indians of Oregon, Duckwater Shoshone Tribe, and the National Congress of American Indians.

Timothy Ward Woolsey, Nespelem, Washington, for amicus curiae Confederated Tribes of the Colville Indian Reservation.

---

## OPINION

PER CURIAM:

A tribal court system exercised jurisdiction over a non-Indian closely held corporation and its non-Indian owner in an unlawful detainer action for breach of a lease of tribal lands and trespass. It entered judgment in favor of the tribe. We examine the extent of an Indian tribe's civil authority over non-Indians acting on tribal land within the reservation. We hold that under the circumstances presented here, where there are no sufficient competing state interests at play, *Nevada v. Hicks*, 533 U.S. 353, 359-60 (2001), the tribe has regulatory jurisdiction through its inherent authority to exclude, independent from the power recognized in *Montana v. United States*, 450 U.S. 544 (1981). Because regulatory jurisdiction exists, we also consider whether adjudicative jurisdiction exists. In light of Supreme Court precedent recognizing tribes' inherent civil authority over non-Indian conduct on tribal land and congressional interest in promoting tribal self-government, we conclude that it does. Finally, applying traditional personal jurisdiction principles, we hold that in this instance, the tribal court has personal jurisdiction over a non-Indian agent acting on tribal land.

# I

In 1975, the Colorado River Indian Tribes ("CRIT") and Water Wheel Camp Recreational Area, Inc. ("Water Wheel") entered into a thirty-two-year business lease of twenty-six acres of CRIT tribal land located within the reservation along the California side of the Colorado River. The land is held in trust by the United States and the local Superintendent of the Bureau of Indian Affairs ("BIA") approved the lease under the authority delegated by the Secretary of the Department of the Interior, as required by law.[1] *See* 25 U.S.C. § 415(a) (2006). Throughout the term of the lease, Water Wheel operated a recreational resort on the leased tribal land that included a marina, convenience store, bar, trailer and camping spaces, and related facilities.

Robert Johnson, a non-Indian, purchased from non-Indian owners half of Water Wheel's stock in 1981 and the remaining stock in 1985, at which point he became president of the corporation. He controlled and operated the Water Wheel resort on CRIT land for more than twenty-two years while living at the site. Under the lease agreement, he collected rents from the resort's subtenants and paid that rent to the tribe. The lease called for renegotiation of the minimum base rental value after twenty-five years to more accurately reflect the current market value, but in 2000, when it was time to renegotiate, the CRIT and Johnson (acting on behalf of Water Wheel) failed to reach an agreement. After that, Water Wheel stopped making payments as required by the lease. Beginning in 2001, the corporation stopped paying the required percentage of gross business receipts. It paid only nominal rent in 2003 and 2004, and failed to pay any rent at all beginning in 2005.

---

[1] Water Wheel contested the status of the land before the tribal court, but waived the argument before the district court. Water Wheel and Robert Johnson concede that outside of the lease, they have no right to occupy or use the land.

When the lease expired on July 6, 2007, Water Wheel and Johnson failed to vacate the property "peaceably and without legal process" as the lease required. Instead, Johnson continued to operate Water Wheel and collect funds from resort patrons, but paid nothing to the tribe. When he refused to vacate, the CRIT filed suit against Water Wheel and Johnson in tribal court for eviction, unpaid rent, damages from the tribe's loss of use of their property, and attorney's fees. Johnson and Water Wheel challenged both the tribe's right to evict them and the jurisdiction of the CRIT tribal courts. They moved to dismiss, arguing in relevant part that the tribal court lacked subject matter jurisdiction under *Montana*, 450 U.S. 544, and lacked personal jurisdiction over Johnson.

The tribal court denied the motions to dismiss and, following a three-day trial on the merits, ruled in favor of the CRIT on all claims. The tribal court found that because Water Wheel had entered into a consensual relationship with the tribe through commercial dealings, the court had subject matter jurisdiction over Water Wheel under *Montana*'s first exception.[2] Regarding Johnson himself, the tribal court reasoned that it had subject matter jurisdiction over the breach of lease under *Montana*'s first exception and that it had personal jurisdiction over him because Johnson had "sufficient minimum contacts" with the CRIT to support the exercise of jurisdiction. Specifically, the court determined that Johnson's business dealings and his continuing trespass after the lease expired provided sufficient contacts necessary to establish personal jurisdiction. The court further reasoned that it had subject matter jurisdiction over Water Wheel and Johnson

---

[2]*Montana*, discussed in greater detail below, held that a tribe may not regulate the activities of non-Indians on non-Indian fee land within the reservation unless one of two exceptions applies. The first exception exists where non-Indians "enter consensual relationships with the tribe or its members," and the second exception exists where the conduct of a non-Indian "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U.S. at 566.

through its own laws and ordinances for purposes of eviction and assessing damages.

Finally, the tribal court noted that Water Wheel and Johnson had repeatedly and willfully disobeyed pretrial orders compelling discovery of financial and corporate records. As a sanction, the court found as true the tribe's contention that Water Wheel and Johnson were "alter egos" and, pursuant to tribal rules of civil procedure that mirror the Federal Rules of Civil Procedure, that the facts embraced in the discovery requests were established as the tribe had claimed. Specifically, the tribal court found that Water Wheel was inadequately capitalized; that the corporation and Johnson had made gifts to each other since 1999 in fraud of creditors; and that Johnson borrowed funds for his own personal use, failed to maintain separate financial records, failed to keep formal corporate board meeting minutes, failed to elect directors, and had commingled corporate money with his own personal assets instead of paying the rent. In light of these factual findings, the tribal court pierced the corporate veil to hold Johnson personally and jointly liable for all damages related to breach of the lease agreement.

The tribal court of appeals affirmed.[3] In a fifty-eight-page opinion, the appellate court held that the CRIT had subject matter jurisdiction both through its inherent sovereign authority and through the first and second *Montana* exceptions. The court noted the importance the Supreme Court has placed on land ownership in determining questions of civil jurisdiction. It also observed that in light of the long-recognized power of Indian tribes to exclude non-Indians from Indian-owned land, the Court has, with one narrow exception, "consistently upheld the exercise of tribal authority over non-member activ-

---

[3]The court reversed the award for trespass damages and remanded for recalculation based on the fair rental value of the formerly leased property. That issue is not before us.

ity *on tribal or other Indian owned land* within an Indian reservation" (emphasis in original).

The appellate court further determined that *Montana*'s first exception was satisfied because the possessory claims of Water Wheel and Johnson flowed solely from a federally approved surface lease of lands owned by the tribe within its reservation and thus clearly constituted a consensual relationship. Additionally, the court found that *Montana*'s second exception was satisfied because substantial tribal revenues were at stake and because, "[f]or the Tribe, as for most Indian tribes, its land constitutes its single most valuable economic asset," and the activities of Johnson and Water Wheel interfered with the tribe's ability to manage and use its own land.

Regarding personal jurisdiction over Johnson, the court found that in agreeing to and benefitting from the lease, Johnson had consented to the tribal court's exercise of jurisdiction. For purposes of the trespass claim, the court found that the damages were properly directed at Johnson as an individual because he had overstayed the lease. The court also noted that both Water Wheel and Johnson had been properly served while on the Water Wheel site within the reservation.

While the case was pending before the tribal court, Water Wheel and Johnson filed a complaint in the District of Arizona seeking declaratory and injunctive relief against the tribal court's exercise of jurisdiction. After the tribal court of appeals issued its decision, the district court reviewed the jurisdictional questions. The district court declined to reach the question whether the tribe's inherent authority to exclude non-Indians from tribal land provided jurisdiction over Water Wheel. Relying on the facts surrounding the lease between the CRIT and Water Wheel, the district court found a consensual relationship existed and that the tribal court had subject matter jurisdiction over Water Wheel under *Montana*'s first exception.[4]

---

[4]The court reasoned that it did not need to reach the question regarding the tribe's inherent authority given its decision that *Montana*'s first excep-

The court further determined that the tribe had not waived its sovereign powers through the lease and that BIA regulations did not preempt tribal court jurisdiction.

The district court rejected the tribe's argument that its inherent power to exclude provides a basis for jurisdiction over Johnson independent of *Montana*, reasoning that *Montana* applied to determine whether a tribe could exercise its inherent authority to exclude. In a footnote, the court attempted to clarify that its decision addressed only whether the tribe's authority to exclude provided a jurisdictional basis for Johnson, not that *Montana* would prevent the tribe from excluding Johnson from tribal land. The court did not consider the connection between the tribe's authority to exclude and its regulatory jurisdiction, nor did it consider whether the tribe's status as landowner made any difference to the analysis.

Considering tribal court's jurisdiction over Johnson, the district court first determined whether Johnson's relationship with the CRIT was consensual. Johnson argued that he had protested the CRIT's involvement and had not understood that he, personally, would be dealing with the tribe, so the relationship was not voluntary. The district court agreed, noting that the tribal court made no factual findings regarding voluntariness to which the clearly erroneous standard of review could be applied. The district court reasoned that the evidence regarding Johnson's personal understanding could not "fairly be characterized as his personal consent to the tribe's jurisdiction," so Johnson could not have entered into a consensual relationship with the tribe.

---

tion provided a basis for jurisdiction. Apparently, the court failed to recognize that in applying *Montana* unnecessarily, it improperly expanded limitations on tribal sovereignty that, with only one narrow exception, have been applied exclusively to non-Indian land.

Finally, the district court rejected the argument that the tribal court had jurisdiction over Johnson through a provision in the lease specifying that Water Wheel, its agents, and its employees would abide by tribal laws and regulations. Nothing in the provision, the court reasoned, suggested that Water Wheel had agreed that its agents would be subject to tribal court jurisdiction. The district court declined to consider the second *Montana* exception, reasoning that the defendants had not made that argument.

Both parties appealed.

## II

We have jurisdiction under 28 U.S.C. § 1291. A decision regarding tribal court jurisdiction is reviewed *de novo*, and factual findings are reviewed for clear error. *Smith v. Salish Kootenai College*, 434 F.3d 1127, 1130 (9th Cir. 2006); *FMC v. Shoshone-Bannock Tribes*, 905 F.2d 1311, 1313-14 (9th Cir. 1990). We have also recognized that because tribal courts are competent law-applying bodies, the tribal court's determination of its own jurisdiction is entitled to "some deference." *Id.* at 1313 (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65-66 (1978)).

As we consider questions of tribal jurisdiction, we are mindful of "the federal policy of deference to tribal courts" and that "[t]he federal policy of promoting tribal self-government encompasses the development of the entire tribal court system, including appellate courts." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16-17 (1987); *see also United States v. Wheeler*, 435 U.S. 313, 332 (1978) (recognizing that "tribal courts are important mechanisms for protecting significant tribal interests").

## III

In considering the extent of a tribe's civil authority over non-Indians on tribal land, we first acknowledge the long-

standing rule that Indian tribes possess inherent sovereign powers, including the authority to exclude, *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983) ("A tribe's power to exclude nonmembers entirely or to condition their presence on the reservation is . . . well established."), unless Congress clearly and unambiguously says otherwise. *United States v. Lara*, 541 U.S. 193, 200 (2004) (recognizing that "the Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as 'plenary and exclusive' " (citations omitted)); *Santa Clara Pueblo*, 436 U.S. at 58, 60 (recognizing Congress's "superior and plenary control" over matters of tribal sovereignty and noting that "a proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent"); *see also* William C. Canby, Jr., *American Indian Law in a Nutshell* 101 (5th ed. 2009) ("Although the doctrine of plenary power of Congress over tribal sovereignty has its critics, it remains in full strength in the courts, so long as Congress makes its intent to limit sovereignty clear." (internal citation omitted)).

From a tribe's inherent sovereign powers flow lesser powers, including the power to regulate non-Indians on tribal land. *South Dakota v. Bourland*, 508 U.S. 679, 689 (1993) (recognizing that a tribe's power to exclude includes the incidental power to regulate). We also adhere to the Supreme Court's instruction that a tribe's adjudicative authority may not exceed its regulatory authority. *Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997). To exercise its inherent civil authority over a defendant, a tribal court must have both subject matter jurisdiction—consisting of regulatory and adjudicative jurisdiction—and personal jurisdiction. The question we consider is whether and to what extent *Montana* limits these powers. We turn first to the question of subject matter jurisdiction.

### A

*Montana* is "the pathmarking case concerning tribal civil authority over nonmembers." *Strate*, 520 U.S. at 445. In *Montana*, the Supreme Court stated that the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Montana*, 450 U.S. at 564. The narrow question the Court considered in light of this test concerned the tribe's exercise of regulatory jurisdiction over non-Indians on *non-Indian* land within the reservation.[5] *Id.* at 557 ("Though the parties in this case have raised broad questions about the power of the Tribe to regulate hunting and fishing by non-Indians on the reservation, the regulatory issue before us is a narrow one . . . the question of the power of the Tribe to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers of the Tribe.").

**[1]** The Court noted two exceptions to this limitation on tribal powers. First, the Court stated that

> [t]o be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of non-members who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.

*Id.* at 565. Second, the Court stated that, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the politi-

---

[5]A reservation may contain both Indian and non-Indian land, and Indian land may also exist outside of a reservation. *See* 18 U.S.C. § 1151 (2006).

cal integrity, the economic security, or the health or welfare of the tribe. *Id.* at 566. These exceptions have come to be known as the two *Montana* exceptions.

Since deciding *Montana*, the Supreme Court has applied those exceptions almost exclusively to questions of jurisdiction arising on non-Indian land or its equivalent. *See analysis infra*. The exception is *Hicks*, discussed in greater detail below, where the Court noted that while land ownership may sometimes be a "dispositive factor" in determining whether a tribe has jurisdiction over a non-Indian, it was not dispositive when weighed against the state's considerable interest in executing a search warrant for an off-reservation crime. *Hicks*, 533 U.S. at 358-60, 363.

Despite the explicitly narrow nature of the question considered in *Hicks*, the district court applied *Montana* to determine whether the CRIT has subject matter jurisdiction over non-Indians Water Wheel and Johnson related to their activities on tribal land within the CRIT reservation. The CRIT and the United States, through its amicus brief, argue that *Montana* does not apply to this case. Their position is that the CRIT's inherent authority to exclude provides regulatory jurisdiction over Water Wheel and Johnson and that there are no competing state interests at play that might otherwise trigger *Montana*'s application. They further suggest that because regulatory jurisdiction exists and neither Congress nor the Supreme Court have said otherwise, the tribal court may also exercise adjudicative jurisdiction. We agree.

As a preliminary matter, we consider the relationship between the tribe's inherent authority to exclude and its authority to exercise jurisdiction. The district court stated, and arguably held despite its footnote indicating otherwise, that a tribe's inherent authority to exclude a non-Indian from tribal land is subject to *Montana*. But the Supreme Court has recognized that a tribe's power to exclude exists independently of its general jurisdictional authority. *See Duro v. Reina*, 495

U.S. 676, 696-97 (1990) (noting that even where tribes lack criminal jurisdiction over a non-Indian defendant, they "possess their traditional and undisputed power to exclude persons whom they deem to be undesirable from tribal lands. . . . Tribal law enforcement authorities have the power to restrain those who disturb public order on the reservation, and if necessary, to eject them. Where jurisdiction to try and punish an offender rests outside the tribe, tribal officers may exercise their power to detain the offender and transport him to the proper authorities"), *superseded on other grounds by congressional statute*, 25 U.S.C. § 1301.

**[2]** *Montana* limited the tribe's ability to exercise its power to exclude only as applied to the regulation of non-Indians on non-Indian land, not on tribal land. *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144-45 (1982) (recognizing a tribe's inherent authority to exclude non-Indians from tribal land, without applying *Montana*); *see also Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 654 (2001) (holding that the Navajo Nation's power to tax, derived in part from its power to exclude, should be considered under *Montana* because, unlike in *Merrion*, the incidence of the tax fell "upon non-members on non-Indian fee land"); *Bourland*, 508 U.S. at 689 (noting that *Montana* established that "when an Indian tribe conveys ownership of its tribal lands to non-Indians, it loses any former right of absolute and exclusive use and occupation of the conveyed lands"); *Merrion*, 455 U.S. at 144-45 ("Nonmembers who lawfully enter tribal lands remain subject to the tribe's *power* to exclude them. . . . When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its *ultimate* power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry." (emphasis in original)); *Montana*, 450 U.S. at 557 (recognizing a tribe's inherent authority to condition the entry of non-Indians on tribal land as a separate matter from whether a tribe may condition the entry of non-Indians on non-Indian land); *Cohen's Handbook of Federal Indian Law* § 4.01[2][e], 220 (Nell Jessup Newton et al. eds., 2005) [here-

inafter *Cohen*] (explaining that "[b]ecause the exclusionary power is a fundamental sovereign attribute intimately tied to a tribe's ability to protect the integrity and order of its territory and the welfare of its members, it is an internal matter over which the tribes retain sovereignty"); *cf. Atkinson Trading Co.*, 532 U.S. 645 (holding that the Navajo Nation's power to exclude did not allow it to tax non-Indians on *non-Indian* fee land (emphasis added)).[6]

---

[6]To support its conclusion that *Montana* applies to a tribe's inherent authority to exclude persons from tribal land, the district court cited *Plains Commerce Bank v. Long Family Land and Cattle Co., Inc.*, 554 U.S. 316 (2008), and *Hardin v. White Mountain Apache Tribe*, 779 F.2d 476 (9th Cir. 1985). *Plains Commerce Bank* considered a tribe's authority to regulate the alienation of non-Indian land, not the tribe's power to exclude non-Indians from tribal lands or its sovereign interest in managing tribal land. The district court misinterpreted passages from that opinion discussing *Montana*'s treatment of regulations that flow from a tribe's inherent tribal government powers on non-Indian lands to stand for the proposition that a tribe's power to exclude is subject to *Montana*. The case the relevant passage in *Plains Commerce Bank* relies upon demonstrates the error in the district court's analysis. *See* 554 U.S. at 335 (citing *Bourland*, 508 U.S. at 691 n.11). In *Bourland*, the Court recognized that a tribe loses the regulatory authority that implicitly exists through its power to exclude when the land in question ceases to be tribal land, and cited *Montana* as supporting that rule. In other words, loss of the power to exclude implies the loss of the incidental power to regulate non-Indians unless a *Montana* exception applies. Thus, *Plains Commerce Bank* does not support the district court's conclusion that a tribe's right to exclude may be exercised on tribal land only if *Montana* is satisfied.

Likewise, *Hardin* stated that the tribe's exclusion of a criminal from the reservation "falls within the Tribe's civil powers" and, citing *Montana*, reasoned that the ordinance was necessary for the health and safety of tribal members. *Hardin*, 779 F.2d at 478. The court then cited *Merrion*, 455 U.S. at 144-45 (recognizing a tribe's authority to exert its inherent power of exclusion over a non-Indian on tribal land without applying *Montana*), for the rule that tribes have the power to place conditions on entry and that a non-Indian on tribal land remains subject to the risk that the tribe will exercise its sovereign power of exclusion. *Hardin*, 779 F.2d at 479.

Reading *Hardin* to stand for the proposition that a tribe's inherent power of exclusion is subject to *Montana* would conflict with Supreme

**[3]** Here, through its sovereign authority over tribal land, the CRIT had power to exclude Water Wheel and Johnson, who were trespassers on the tribe's land and had violated the conditions of their entry. Having established that the tribe had the power to exclude, we next consider whether it had the power to regulate. The authority to exclude non-Indians from tribal land necessarily includes the lesser authority to set conditions on their entry through regulations. *Merrion*, 455 U.S. at 144 (noting that the power to exclude "necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct"); *Bourland*, 508 U.S. at 689 (noting that in opening up the Cheyenne Sioux Tribe's tribal lands for public use, Congress "eliminated the Tribe's power to exclude non-Indians from these lands, and with that the incidental regulatory jurisdiction formerly enjoyed by the Tribe"); *id.* at 691 n.11 ("Regulatory authority goes hand in hand with the power to exclude."); *see also Montana*, 450 U.S. at 557 (recognizing a tribe's inherent authority to condition the entry of non-Indians on tribal land through regulations).

As a general rule, both the Supreme Court and the Ninth Circuit have recognized that *Montana* does not affect this fundamental principle as it relates to regulatory jurisdiction over non-Indians on Indian land. *See Bourland*, 508 U.S. at 688-89 (describing *Montana* as establishing that when tribal land is

Court precedent, including the very case *Hardin* cites for support. *Hardin* is best distinguished as considering the narrow question of whether the tribe's ordinance was an impermissible punishment against a non-Indian for a criminal act. The court held the ordinance did not conflict with *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978), reasoning that, despite *Oliphant*'s prohibition against tribes asserting criminal jurisdiction over non-Indians, civil jurisdiction remains. *See Hardin*, 779 F.2d at 478-79. *Hardin* referenced *Montana*'s second exception without considering whether it needed to do so, and appears to have cited the case primarily to support its conclusion that despite a lack of criminal jurisdiction, tribes retain some forms of civil jurisdiction over non-Indians. *See id.* at 478.

converted to non-Indian land, a tribe loses its inherent power to exclude non-Indians from that land and thereby also loses "the incidental regulatory jurisdiction formerly enjoyed by the Tribe"); *see also Merrion*, 455 U.S. at 144-45 (upholding a tribal tax on non-Indians operating a business on tribal land as a condition of entry derived from the tribe's inherent power to exclude, without applying *Montana*); *Strate*, 520 U.S. at 456 (noting that the land in question was equivalent to non-Indian land and that "*Montana*, accordingly, governs this case"); *Mescalero Apache Tribe*, 462 U.S. at 330-31 (determining that *Montana* did not apply to the question of a tribe's regulatory authority over nonmembers on reservation trust land because "*Montana* concerned lands located within the reservation but not owned by the Tribe or its members"); *McDonald v. Means*, 309 F.3d 530, 540 n.9 (9th Cir. 2002) (as amended) (rejecting the argument that *Montana* applies to tribal land because *Montana* limited its holding to non-Indian lands and *Strate* confirmed that limitation); *Burlington N. R. Co. v. Red Wolf*, 196 F.3d 1059, 1062-63 (9th Cir. 1999) ("The threshold question in this appeal is whether *Montana*'s main rule applies, that is, whether the property rights at issue are such that the land may be deemed 'alienated' to non-Indians.").

**[4]** We must therefore conclude that the CRIT's right to exclude non-Indians from tribal land includes the power to regulate them[7] unless Congress has said otherwise, or unless

---

[7]Further bolstering our conclusion that the tribe has regulatory jurisdiction is the fact that this is an action to evict non-Indians who have violated their conditions of entry and trespassed on tribal land, directly implicating the tribe's sovereign interest in managing its own lands. *See Plains Commerce Bank*, 554 U.S. at 334-35 ("By virtue of their incorporation into the United States, the tribe's sovereign interests are now confined to managing tribal land . . . protecting tribal self-government, and controlling internal relations." (internal citations and quotation marks omitted)); *United States. v. Mazurie*, 419 U.S. 544, 557 (1975) ("Thus it is an important aspect of this case that Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory."); *see also Merrion*, 455 U.S. at 145 n.12 (recognizing that a tribe's sovereign power over tribal lands is distinguishable from its power over reservation land generally).

the Supreme Court has recognized that such power conflicts with federal interests promoting tribal self government. *Iowa Mut. Ins. Co.*, 480 U.S. at 18 ("Tribal authority over activities of non-Indians on reservation lands is an important part of tribal sovereignty. Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." (internal citations omitted)); *Merrion*, 455 U.S. at 146 (noting the "established views that Indian tribes retain those fundamental attributes of sovereignty . . . which have not been divested by Congress or by necessary implication of the tribe's dependent status"); *Santa Clara Pueblo*, 436 U.S. at 56 ("Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess.").

**[5]** We see no evidence of congressional intent to limit the CRIT's regulatory jurisdiction in this instance, and the Supreme Court has on only one occasion established an exception to the general rule that *Montana* does not apply to jurisdictional questions arising from the tribe's authority to exclude non-Indians from tribal land. *See Hicks*, 533 U.S. 353. In *Hicks*, the Court held that where a state has a competing interest in executing a warrant for an off-reservation crime, the tribe's power of exclusion is not enough on its own to assert regulatory jurisdiction over state officers and *Montana* thus applies. *Id.* at 359-60 (rejecting the tribe's argument that it could exercise its regulatory authority over state officers as a condition of entry for purposes of executing a search warrant).

Even though in its analysis the Court interpreted *Montana* broadly as applying to both Indian and non-Indian land, the Court explicitly recognized that in some cases, land ownership "may sometimes be a dispositive factor" in establishing a tribal court's regulatory jurisdiction over non-Indians. *Id.* at 360. *Hicks* expressly limited its holding to "the question of tribal-court jurisdiction over state officers enforcing state law" and left open the question of tribal court jurisdiction

over nonmember defendants generally. *Id.* at 358 n.2; *id.* at 371 (noting that the issue being considered concerned "a narrow category of outsiders"). Furthermore, the Court did not overrule its own precedent specifying that *Montana* ordinarily applies only to non-Indian land.

We have recognized the limited applicability of *Hicks*. *See McDonald*, 309 F.3d at 540 n.9 (rejecting the argument that *Montana* should be extended to bar tribal jurisdiction over the conduct of non-Indians on tribal land because doing so would be inconsistent with *Montana*'s narrow holding and "[e]ven if *Hicks* could be interpreted as suggesting that the *Montana* rule is more generally applicable than either *Montana* or *Strate* have allowed, *Hicks* makes no claim that it modifies or overrules *Montana*"); *see also Elliott v. White Mtn. Apache Tribal Court*, 566 F.3d 842, 850 (9th Cir. 2009) (acknowledging "the Supreme Court's instruction that ownership of the land may be dispositive in some cases" concerning the extent of a tribe's regulatory jurisdiction over a non-Indian and explicitly rejecting the argument that *Hicks* forecloses tribal court jurisdiction over non-Indians on tribal land).

**[6]** To summarize, Supreme Court and Ninth Circuit precedent, as well as the principle that only Congress may limit a tribe's sovereign authority, suggest that *Hicks* is best understood as the narrow decision it explicitly claims to be. *See Hicks*, 533 U.S. at 358 n.2. Its application of *Montana* to a jurisdictional question arising on tribal land should apply only when the specific concerns at issue in that case exist. Because none of those circumstances exist here, we must follow precedent that limits *Montana* to cases arising on non-Indian land. Doing otherwise would impermissibly broaden *Montana*'s scope beyond what any precedent requires and restrain tribal sovereign authority despite Congress's clearly stated federal interest in promoting tribal self-government. *See Mescalero Apache Tribe*, 462 U.S. at 335-36 (recognizing that as a "necessary implication" of Congress's broad commitment to further tribal self-government, "tribes have the power to manage

the use of [their] territory and resources by both members and nonmembers, to undertake and regulate economic activity within the reservation, and to defray the cost of governmental services by levying taxes" (internal citations omitted)). We therefore hold that the CRIT has regulatory jurisdiction over Water Wheel and Johnson for claims arising from their activities on tribal land, independent of *Montana*.

**[7]** In this instance, where the non-Indian activity in question occurred on tribal land, the activity interfered directly with the tribe's inherent powers to exclude and manage its own lands, and there are no competing state interests at play, the tribe's status as landowner is enough to support regulatory jurisdiction without considering *Montana*. Finding otherwise would contradict Supreme Court precedent establishing that land ownership may sometimes be dispositve and would improperly limit tribal sovereignty without clear direction from Congress.

**B**

**[8]** Since deciding *Montana*, the Supreme Court has specified limits to the extent of a tribe's adjudicative jurisdiction over non-Indians three times: first in *Strate*, then in *Hicks*, and most recently in *Plains Commerce Bank*. In all three cases, the Court articulated the general rule that a tribe's adjudicative jurisdiction may not exceed its regulatory jurisdiction, and in all three cases the Court found the tribe lacked regulatory, and therefore adjudicative, authority. The Supreme Court has not yet considered the question of adjudicative authority where regulatory jurisdiction exists. However, it is clear that the general rule announced in *Strate*, and confirmed in *Hicks* and *Plains Commerce Bank,* that adjudicative jurisdiction is confined by the bounds of a tribe's regulatory jurisdiction, applies. Beyond that, because the Supreme Court has repeatedly recognized that only Congress may restrict a tribe's inherent sovereignty, we must consider the question of the CRIT's adjudicative jurisdiction without contradicting the

rules that have long governed tribes' civil authority over non-Indians on tribal land.

Because the CRIT has regulatory jurisdiction, there is no danger that recognizing adjudicative jurisdiction would conflict with *Strate*, *Hicks*, or *Plains Commerce Bank*. Water Wheel, Johnson, and the district court erroneously point to *Philip Morris USA, Inc. v. King Mountain Tobacco Co., Inc.*, 569 F.3d 932 (9th Cir. 2009), for the proposition that *Montana* applies to questions of a tribe's adjudicative authority. In *Philip Morris* we determined that the Yakama Tribe lacked regulatory, and therefore adjudicative, jurisdiction over non-Indian corporation Philip Morris regarding federal trademark registration. 569 F.3d at 945 (Fletcher, W., J., concurring); *see also id.* at 942.

**[9]** In reaching its conclusion, the panel articulated its understanding of the rules for determining both regulatory and adjudicative jurisdiction. It cited *Hicks*, *Montana*, and *Strate* for the proposition that a tribe's adjudicative authority does not exceed its regulatory authority. *Id.* at 939. It then stated that "[t]he *Montana* framework is applicable to tribal adjudicative jurisdiction, which extends no further than the *Montana* exceptions," *id*, and that "in this circuit, the *Montana* analysis is controlling in tribal jurisdiction cases." *Id.* at 941. But Water Wheel's and Johnsons's suggestion that these statements require us to apply *Montana* to the question of adjudicative jurisdiction is unconvincing when considered against context and controlling precedent.

The majority's statement in *Phillip Morris* that *Montana* applies to questions of adjudicative jurisdiction only aligns with Supreme Court precedent if interpreted as saying that to determine whether adjudicative jurisdiction exists, a court must first determine whether regulatory jurisdiction exists. *See Hicks*, 533 U.S. at 357, 374 (analyzing regulatory jurisdiction first, then determining that because the tribe lacked regulatory jurisdiction it necessarily lacked adjudicative juris-

diction); *see also Plains Commerce Bank*, 554 U.S. at 330 (holding that "the Tribal Court lacks jurisdiction to hear the Longs' discrimination claim *because the Tribe lacks the civil authority to regulate* the Bank's sale of its fee land." (emphasis added)).

**[10]** Thus, if *Montana* applies to the question of regulatory jurisdiction, it necessarily limits the court's inquiry into adjudicative jurisdiction because the Supreme Court has held that a tribe's adjudicative jurisdiction may not exceed its regulatory jurisdiction. *Philip Morris* did not and could not overrule *McDonald*, where the Ninth Circuit expressly rejected the argument that *Hicks* applies to tribal land outside the specific circumstances that existed in that case, and it could not overrule Supreme Court precedent establishing and confirming the rule that *Montana*'s analysis applies specifically to non-Indian land. For those reasons, *Philip Morris*'s comments regarding jurisdiction are best understood as a reiteration of the Supreme Court's rule that a tribe's adjudicative jurisdiction may not exceed its regulatory jurisdiction.

Furthermore, *Philip Morris* did not involve a question related to the tribe's authority to exclude or its interest in managing its own land. To the contrary, the activity in question occurred off reservation. The tribal court clearly lacked jurisdiction and, arguably, *Montana* did not even apply because there the Court considered a tribe's regulatory jurisdiction over activities on non-Indian fee land within the reservation, not beyond the reservation's borders where the tribe lacked authority to regulate a non-Indian. *Atkinson Trading Co.*, 532 U.S. at 657 n.12 (observing that except in limited circumstances, "there can be no assertion of civil authority beyond tribal lands"); *see Philip Morris*, 569 F.3d at 945-46 (Fletcher, W., J., concurring) (noting that the panel majority's opinion answers a simple and straightforward question with "an extended opinion containing a great deal of dicta").

Because recognizing adjudicative jurisdiction would not conflict with the rule articulated in *Strate*, *Hicks*, and *Plains*

*Commerce Bank*, we consider whether recognizing adjudicative jurisdiction would conflict with earlier precedent. Prior to *Hicks*, the general rule for adjudicative authority over the conduct of non-Indians on tribal land was that tribes had jurisdiction. *See Iowa Mut. Ins. Co.*, 480 U.S. at 18 (observing that a tribe's inherent civil jurisdiction over non-Indian activities on the reservation should be presumed unless Congress has said otherwise); *Santa Clara Pueblo*, 436 U.S. at 65 ("Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians."); *Williams v. Lee*, 358 U.S. 217, 220 (1959) (recognizing the traditional rule that if a crime occurs within a reservation "by or against an Indian, tribal jurisdiction or that expressly conferred on other courts by Congress has remained exclusive," and accordingly upholding exclusive tribal court jurisdiction over an action brought by a non-Indian against an Indian for an on-reservation debt).

The Supreme Court recently reaffirmed those long-standing principles when it recognized the general rule that a tribe has plenary jurisdiction over tribal land until or unless that land is converted to non-Indian land. *See Plains Commerce Bank*, 554 U.S. at 328 ("Our cases have made clear that once tribal land is converted into fee simple, the tribe loses plenary jurisdiction over it."); *see also Bourland*, 508 U.S. at 689 (recognizing that the change in land status from Indian to non-Indian abrogates the tribe's power to exclude and "implies the loss of regulatory jurisdiction over the use of the land by others").

[11] Here, the land is tribal land and the tribe has regulatory jurisdiction over Water Wheel and Johnson. While it is an open question as to whether a tribe's adjudicative jurisdiction is equal to its regulatory jurisdiction, the important sovereign interests at stake, the existence of regulatory jurisdiction, and long-standing Indian law principles recognizing tribal sovereignty all support finding adjudicative jurisdiction here. Any other conclusion would impermissibly interfere with the

tribe's inherent sovereignty, contradict long-standing principles the Supreme Court has repeatedly recognized, and conflict with Congress's interest in promoting tribal self-government. Accordingly, we hold that in addition to regulatory jurisdiction, the CRIT has adjudicative jurisdiction over both Water Wheel and Johnson.[8]

## C

*Montana* does not apply to this case. However, because we disagree not only with the district court's application of the case in the first place, but also with its interpretation of the case as it applies to Johnson, we briefly explain why, even if *Montana* applied, the tribe would have subject matter jurisdiction.

Water Wheel and Johnson propose that *Montana*'s first exception requires a consensual relationship and that the relationship between the defendants and the tribe was not consen-

---

[8]The district court correctly rejected Water Wheel's argument that the CRIT waived tribal jurisdiction. Water Wheel's rights under the lease terminated when it expired in 2007. Nevertheless, the corporation relies on a parsed reading of the lease concerning the Secretary of the Interior's powers to enforce its provisions. The cited language does not constitute a clear and unmistakable waiver of the CRIT's sovereign power. *See Merrion*, 455 U.S. at 148; *Ariz. Public Serv. Co. v. ASPAAS*, 77 F.3d 1128, 1135 (9th Cir. 1995).

Water Wheel also fails in arguing that (1) BIA regulations preclude tribal court jurisdiction and (2) its notice to the BIA of tribal harassment triggered the equivalent of a dispute resolution process that negates the tribe's authority to evict. Nothing in the BIA regulations limits what the tribe can do and the regulations specifically recognize that tribes may invoke remedies available to them under a lease. 25 C.F.R. § 162.619(a)(3). Furthermore, the "extent of the BIA's policing of Indian leases is to ensure that the lessees, whether Indian or non-Indian, fulfill their contractual obligations . . . it has no statutory or regulatory authority to take action against an Indian lessor. Such actions must be brought in tribal or federal court." *Hawley Lake Homeowners' Ass'n v. Deputy Assistant Sec'y*, 13 IBIA 276, 289 (1985).

sual. They also suggest that we may not consider the second *Montana* exception because the tribe failed to argue that exception before the district court. As an initial matter, we disagree that the tribal parties waived their arguments regarding the second *Montana* exception. They sufficiently preserved both jurisdictional grounds, on which the tribal courts expressly relied in reaching their decisions and which the tribal parties raised in their district court brief. *See O'Rourke v. Seaboard Surety Co.*, 887 F.2d 955, 957 (9th Cir. 1989) ("There is no bright-line rule to determine whether a matter has been properly raised. A workable standard, however, is that the argument must be raised sufficiently for the trial court to rule on it." (internal citations omitted)).

Regarding claims related to Water Wheel, the district court correctly found that the corporation's long-term business lease with the CRIT for the use of prime tribal riverfront property established a consensual relationship and that the tribe's eviction action bears a close nexus to that relationship. The corporation had full knowledge that the leased land was tribal property and that under the lease's terms, CRIT laws and regulations applied to the land and Water Wheel's operations. The tribe clearly had authority to regulate the corporation's activities under *Montana*'s first exception and—considering that the business also involved the use of tribal land and that the business venture itself constituted a significant economic interest for the tribe—under the second exception as well. *Montana*, 450 U.S. at 565.

The district court then considered whether Johnson's personal twenty-two-year relationship with the CRIT was subjectively voluntary and consensual under *Montana*'s first exception.[9] The court erred in applying a subjective test to the

_____

[9]To assess Johnson's subjective understanding of his relationship with the tribe, the district court improperly relied on the Second Declaration of Robert Johnson, which was not before the tribal court. *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845 (1985). Because

question of subject matter jurisdiction, which is not required under *Montana* or its federal common law progeny, and is irrelevant to resolving subject matter jurisdiction over a tort claim. The Supreme Court has indicated that tribal jurisdiction depends on what non-Indians "reasonably" should "anticipate" from their dealings with a tribe or tribal members on a reservation. *Plains Commerce Bank*, 554 U.S. at 338.

Regarding the tribe's regulatory jurisdiction over the breach of contract claim against Johnson personally, Johnson argues the tribe lacks jurisdiction because any relationship he entered into was on behalf of the corporation and not himself. To support his position, Johnson cites *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 348 (1985) ("As an inanimate entity, a corporation must act through agents."). Outside of the Indian law context, this argument is often couched in terms of the "fiduciary shield rule" doctrine, an equitable doctrine courts sometimes use to insulate corporate employees acting in their official capacities from *personal jurisdiction* in a distant forum. Robert A. Koenig, *Personal Jurisdiction and the Corporate Employee: Minimum Contacts Meet the Fiduciary Shield*, 38 Stan. L. Rev. 813, 813, 818 (1986). In that context, the Supreme Court has rejected mechanical application of the rule and instructed that courts should consider the circumstances to determine whether a defendant should "reasonably anticipate being haled into court" in the forum state. *Calder v. Jones*, 465 U.S. 783, 790 (1984) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Specifically, courts should consider "the relationship among the defendant, the forum, and the litigation." *Keeton v. Hustler Magazine, Inc.*,

the district court's review is akin to appellate review of the tribal court record, this was error. *Cf. id.* at 856 ("[T]he orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed.").

465 U.S. 770, 775 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).

Subject matter jurisdiction, on the other hand, concerns the authority of a court to hear cases of a particular subject matter and usually has nothing to do with the individual actions of the parties. But under *Montana*'s first exception, a tribe's exercise of subject matter jurisdiction over a non-Indian defendant depends on the existence of a "consensual relationship" between the non-Indian defendant and the tribe or its members. Thus, the nature and extent of an individual defendant's actions come into play.

We have recognized that the "jurisprudential contours of what reasons suffice for the court to disregard the corporate form for jurisdictional purposes are somewhat indistinct." *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 520 (9th Cir. 1989). Nevertheless, we have held that "the corporate form may be ignored" in cases where the corporation is the "alter ego" of the defendant, or where there is an "identity of interests" between the corporation and the individual. *Id.* at 520-21.

In this case, it is a matter of established fact that Johnson was Water Wheel's "alter ego" and, thus, "corporate separateness is illusory." *Katzir's Floor and Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1149 (9th Cir. 2004). Any actions Johnson took on behalf of Water Wheel, he also took on behalf of himself. We therefore consider whether Johnson as an individual entered into a consensual relationship with the tribe, without regard to any protections the corporate form might otherwise offer.

For purposes of determining whether a consensual relationship exists under *Montana*'s first exception, consent may be established "expressly or by [the nonmember's] actions." *Plains Commerce Bank*, 554 U.S. at 337. There is no requirement that Johnson's commercial dealings with the CRIT be a

matter of written contract or lease actually signed by Johnson. *See Montana*, 450 U.S. at 565 (tribes may regulate the activities of nomembers who enter into "*commercial dealing*, contracts, leases, *or other arrangements*" (emphasis added)). We are to consider the circumstances and whether under those circumstances the non-Indian defendant should have reasonably anticipated that his interactions might "trigger" tribal authority. *Id.* at 338.

Johnson owned and operated Water Wheel on tribal land for more than twenty years and had extensive dealings with the CRIT before the lease expired. Additionally, Johnson was on notice through the leases's explicit terms that Water Wheel, its *agents*, and employees were subject to CRIT laws, regulations, and ordinances. These facts adequately support the tribal court's conclusion that Johnson had entered into a consensual relationship with the tribe and could reasonably anticipate that the tribe would exercise its jurisdictional authority. Johnson's subjective beliefs regarding his relationship with the tribe do not change the consensual nature of that relationship for purposes of regulatory jurisdiction. Moreover, the tribe's claims for unpaid rent and related damages arose directly from this relationship.

As noted above, the commercial dealings between the tribe and Johnson involved the use of tribal land, one of the tribe's most valuable assets. Thus, if *Montana* applied to the breach of contract claim, either exception would provide regulatory jurisdiction over Johnson.

As for the trespass claim, there is no legal or logical basis to require a consensual relationship between a trespasser and the offended landowner. This is particularly true when the trespass is to tribal land, the offended owner is the tribe, and the trespasser is not a tribal member. *Merrion*, 455 U.S. at 144. If tribes lacked authority to evict holdover tenants and their agents, tribes would be discouraged from entering into

financially beneficial leases with nonmembers for fear of losing control over tribal land.

Evaluating the trespass claim under *Montana*'s second exception, unpaid rent and percentages of the business's gross receipts here totaled $1,486,146.42 at the time of the tribal court's judgment. Johnson's unlawful occupancy and use of tribal land not only deprived the CRIT of its power to govern and regulate its own land, but also of its right to manage and control an asset capable of producing significant income. Thus, in addition to the tribe's undisputed authority to eject trespassers from its own land, *Montana*'s second exception would provide regulatory jurisdiction.

**[12]** Our analysis of adjudicative jurisdiction, *see supra* Part III.B, applies once regulatory jurisdiction is established under *Montana*, and, accordingly, the tribe would have both regulatory and adjudicative jurisdiction over Water Wheel and Johnson even if *Montana* applied.

**IV**

**[13]** To exercise civil authority over a defendant, a tribal court must have both personal jurisdiction and subject matter jurisdiction. *See* 18 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 8644.50 (rev. perm. ed., 2006) ("Personal jurisdiction is, of course, distinguishable from subject matter jurisdiction."); *see also Cohen* § 7.02[2], 604 ("For a tribal court to hear a case, it must have not only subject matter jurisdiction under both tribal and federal law, but also personal jurisdiction over the defendant."). One of the most "firmly established principles of personal jurisdiction" is that personal jurisdiction exists over defendants physically present in the forum state. *Burnham v. Superior Court*, 495 U.S. 604, 610 (1990). In-state personal service also serves as a basis for personal jurisdiction. *Id.* at 615-16.

**[14]** Johnson lived on tribal land, which on its own serves as a basis for personal jurisdiction. Additionally, he was

served with tribal process at the Water Wheel location on tribal land, and that service within the tribal court's territorial jurisdiction is also sufficient to confer personal jurisdiction. We therefore hold that the tribal court has personal jurisdiction over Johnson.

To the extent Johnson argues that the fiduciary shield rule prevents the tribal court from exercising personal jurisdiction over him, his argument fails. Assuming the fiduciary shield rule applies to defendants present in the forum state, it would not protect Johnson, an "alter ego" to Water Wheel. *See Katzir's Floor & Home Design, Inc.*, 394 F.3d at 1149; *see also Keeton*, 465 U.S. at 781 n.13 ("[W]e today reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity. . . . Each defendant's contacts with the forum State must be assessed individually.") (citing *Calder*, 465 U.S. at 790). Furthermore, courts have held that jurisdiction over a corporate agent is proper where the agent was not faithfully pursuing corporate interests. *See* Koenig, *supra*, at 824-25.

Absent the fiduciary shield, a court may exercise personal jurisdiction over a defendant where that defendant has sufficient minimum contacts with the forum state such that the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In his role as president and owner of the corporation, Johnson failed to pay rent and receipts owed to the tribe pursuant to the lease and failed to surrender the property peacefully. He also failed to adhere to corporate formalities in that he had, among other things, commingled personal and business funds, failed to maintain separate financial records, and borrowed and used Water Wheel funds for his personal use and the use of third persons, instead of paying the CRIT.

Johnson had notice through the lease that, as an agent of Water Wheel, he was subject to CRIT laws, regulations, and ordinances. He lived and operated a business on the tribe's

land within its reservation for more than twenty years. Certainly it was reasonable to anticipate that he could be haled into tribal court. The tribal court properly found personal jurisdiction over Johnson for the claims related to unpaid rent due under the lease and for attorney's fees.

[15] As for damages related to his unlawful trespass, for more than nineteen months after the lease expired Johnson continued unauthorized operation of a business on tribal land, collected rents, and paid absolutely nothing to the tribe. The tribal court had personal jurisdiction over Johnson for purposes of the trespass claim and damages arising from that violation. *See Calder*, 465 U.S. at 790.

[16] Johnson clearly had sufficient minimum contacts with the CRIT and its tribal land to satisfy considerations of fairness and justice. *Int'l Shoe Co.*, 326 U.S. at 316; *see also Davis*, 885 F.2d 515, 520 (9th Cir. 1989). That he acted unlawfully and wrongfully on behalf of a corporation is no defense. *Calder*, 465 U.S. at 790.

## V

The judgment of the district court is AFFIRMED as to Water Wheel Camp Recreational Area, Inc., and REVERSED with respect to Robert Johnson. The district court's order directing the tribal court to vacate its judgment against Robert Johnson and to cease any litigation concerning Robert Johnson personally is VACATED.[10] The case is REMANDED for entry of judgment upholding the tribal court's jurisdiction. Costs are awarded to the tribal parties.

---

[10]The CRIT's motion for judicial notice also includes documents outside the tribal court record and is therefore denied. *See supra* note 9.