Dissent by Judge CHRISTEN
OPINION
FRIEDLAND, Circuit Judge:
This appeal requires us to decide whether it is “colorable or plausible” that a tribal adjudicative forum has jurisdiction over employment-related claims against two public school districts operating schools on leased tribal land. Because the claims arise from conduct on tribal land and implicate no state criminal law enforcement, interests, we conclude that tribal jurisdiction is colorable or plausible under our court’s interpretation of Nevada v. Hicks, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). Well-established exhaustion principles therefore require that the tribal forum have the first opportunity to evaluate its own jurisdiction over this case, including the nature of the state and tribal interests involved. We thus reverse the district court’s decision enjoining tribal forum proceedings.
I.
The question of tribal jurisdiction arose when a group of current and former employees (the “Employees”) of two Arizona public school districts, Window Rock Unified School District and Pinon Unified School District (the “Districts”), filed complaints with the Navajo Nation Labor Commission (the “Commission”).
The Districts both operate schools on land leased from the Navajo Nation (the “Nation”). Window Rock’s lease requires the school district to abide by Navajo laws, to the extent that they do not conflict with Arizona or federal law, and it further provides that the agreement to abide by Navajo laws does not forfeit any rights under state or federal laws. Pinon’s lease with the Nation does not mention Navajo law.
In their complaints before the Commission, some of the Employees alleged that the Districts owed them merit pay under Arizona law and others alleged that the Districts had violated their rights under the Navajo Preference in Employment Act.[1] The Commission eventually consolidated all of the Employees’ complaints.
The Districts moved to dismiss the complaints on the ground that the Commission lacked jurisdiction over personnel decisions made by Arizona public school districts. Following a motion hearing, the Commission ordered additional discovery on the relationship between the Nation and the Districts.
Before the Commission could hold an evidentiary hearing on the additional discovery, the Districts filed suit in federal district court seeking a declaration that “the [Commission] and the Navajo tribal *897 courts lack jurisdiction over public school districts’ employment decisions and practices conducted on the Navajo Reservation.” The Districts also sought an injunction “to bar further prosecution of those claims in the tribal courts due to the lack of jurisdiction.” The Commission, joined by the Employees, moved to dismiss for failure to exhaust tribal remedies. The Districts countered with a motion for summary judgment, asserting that tribal jurisdiction was so plainly lacking that the Districts did not need to exhaust tribal remedies. The Commission responded that summary judgment was unwarranted, particularly in the absence of fact-finding by the Commission. The Employees similarly argued that summary judgment was improper, and they also filed a Rule 56(f) motion to stay summary judgment proceedings to allow discovery.
The district court held that tribal jurisdiction was so plainly lacking that exhaustion in the tribal forum was not required. Accordingly, it denied the Commission and Employees’ motion to dismiss and the Employees’ motion to stay summary judgment proceedings. It also granted summary judgment to the Districts and enjoined further tribal proceedings. The Commission and Employees timely appealed.
II.
“We review questions of tribal court jurisdiction and exhaustion of tribal court remedies de novo and factual findings for clear error.” Grand Canyon Skywalk Dev., LLC v. ‘Sa’ Nyu Wa Inc., 715 F.3d 1196, 1200 (9th Cir. 2013), cert. denied sub nom. Grand Canyon Skywalk Dev., LLC v. Grand Canyon Resort Corp., — U.S. -, 134 S.Ct. 825, 187 L.Ed.2d 686 (2013). The merits of the Employees’ complaints were not before the district court, nor are they before us — the only question presented here is whether tribal jurisdiction is so plainly lacking that the district court properly enjoined tribal proceedings.[2]
III.
A tribal adjudicative body generally must have the first opportunity to evaluate its jurisdiction over a matter pending before it. In National Farmers Union Insurance Cos. v. Crow Tribe of Indians, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), the Supreme Court explained the importance of this exhaustion requirement: “[Congress’s] policy of supporting tribal self-government and self-determination ... favors a rule that will provide the forum whose jurisdiction is being chal *898 lenged the first opportunity to evaluate the factual and legal bases for the challenge.” Id. at 856, 105 S.Ct. 2447. The Court reasoned that requiring exhaustion of jurisdictional questions in a tribal forum would not only appropriately respect “tribal self-government and self-determination,” but would also serve “the orderly administration of justice in the federal court ... by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed.” Id. Moreover, “[ejxhaustion of tribal court remedies ... will encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction, and will also provide other courts with the benefit of their expertise in such matters in the event of further judicial review.” Id. at 857, 105 S.Ct. 2447.[3]
In light of the importance of exhaustion, federal courts will excuse the failure to exhaust in only four circumstances. See Elliott v. White Mountain Apache Tribal Court, 566 F.3d 842, 847 (9th Cir. 2009). The Districts argue that one of these circumstances exists here: “when it is ‘plain’ that tribal court jurisdiction is lacking, so that the exhaustion requirement ‘would serve no purpose other than delay.’” Id. (quoting Nevada v. Hicks, 533 U.S. 353, 369, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001)). We have explained that the “plainly lacking” exception to the exhaustion requirement does not apply when “jurisdiction is ‘colorable’ or ‘plausible.’ ” Id. at 848 (quoting Atwood v. Fort Peck Tribal Court Assiniboine, 513 F.3d 943, 948 (9th Cir. 2008)). We must therefore decide whether tribal jurisdiction in this case is colorable or plausible.
IV.
Our caselaw has long recognized two distinct frameworks for determining whether a tribe has jurisdiction over a case involving a non-tribal-member defendant: (1) the right to exclude, which generally applies to nonmember conduct on tribal land; and (2) the exceptions articulated in Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), which generally apply to nonmember conduct on non-tribal land. The Commission and Employees argue that tribal jurisdiction is colorable in this case under either framework. The Districts respond that Nevada v. Hicks, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), eliminated the first framework such that jurisdiction over a nonmember exists only if a Montana exception applies, regardless of whether the relevant conduct occurred on tribal or non-tribal land.
We have repeatedly rejected the Districts’ reading of Hicks, and today we reaffirm that the right-to-exclude framework continues to exist. Our court has read Hicks as creating only a narrow exception to the general rule that, absent contrary provisions in treaties or federal statutes, tribes retain adjudicative authority over nonmember conduct on tribal land — land over which the tribe has the right to exclude. We have held that Hicks applies “only when the specific concerns at issue in that case exist.” Water Wheel Camp Recreational Area, Inc. v. LaRance, 642 F.3d 802, 813 (9th Cir. 2011). The specific concerns at issue in Hicks related to enabling state officers to enforce state *899 criminal laws for crimes that occurred off the reservation. 533 U.S. at 358 n.2, 121 S.Ct. 2304. Because Arizona’s interest in the enforcement of state criminal laws is not implicated here, we reject the Districts’ argument that any state interest in this case plainly defeats jurisdiction under Hicks.[4] Contrary to the dissent’s arguments, however, this is not to say that state interests beyond those in criminal law enforcement could never trigger application of Hicks. Rather, we hold only that because our caselaw leaves open the question of what state interests might be sufficient to preclude tribal jurisdiction over disputes arising on tribal land, tribal jurisdiction is plausible enough here that exhaustion is required.
A.
To understand what Hicks did and did not do, it is important to situate that case in the context of other Supreme Court precedent.
1.
We begin with the general principle that a tribe’s right to exclude non-tribal members from its land imparts regulatory and adjudicative jurisdiction over conduct on that land.
The Supreme Court has long recognized that Indian tribes have sovereign powers, including the power to exclude non-tribal members from tribal land. See, e.g., New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 333, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983). A tribe’s regulatory authority derives from these sovereign powers. As the Supreme Court has explained:
This power [to exclude] necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct, such as a tax on business activities conducted on the reservation. When a .tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its ultimate power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry. However, it does not follow that the lawful property right to be on Indian land also immunizes the non-Indian from the tribe’s exercise of its lesser-included power to tax or to place other conditions on the non-Indian’s conduct or continued presence on the reservation.
Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 144-45, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982).
In Strate v. A-1 Contractors, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), the Supreme Court tied the scope of adjudicative jurisdiction to regulatory jurisdiction by holding that “[a]s to nonmembers, ... a tribe’s adjudicative jurisdiction does not exceed its legislative jurisdiction.”[5] Id. at 453, 117 S.Ct. 1404. This suggested that, because tribes generally maintain the power to exclude and thus to regulate nonmembers on tribal land, tribes generally also retain adjudicative jurisdiction over nonmember conduct on tribal land.
The federal government may, however, limit a tribe’s power either by treaty or by statute. See Iowa Mut. Ins. *900 Co. v. LaPlante, 480 U.S. 9, 18, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). In interpreting the extent of any such limits, courts do not “lightly assume that Congress ... intended] to undermine Indian self-government.” Michigan v. Bay Mills Indian Cmty., — U.S. -, 134 S.Ct. 2024, 2032, 188 L.Ed.2d 1071 (2014). Thus, “[c]ivil jurisdiction over ... activities [of non-Indians on tribal land] presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute.” Iowa Mut Ins. Co., 480 U.S. at 18, 107 S.Ct. 971. On the other hand, criminal jurisdiction over non-Indians for offenses committed on tribal land does not presumptively lie in the tribal courts. See Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 195, 206-08, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978).[6] The Supreme Court has made clear that this distinction rests largely on the difference between Congress’s traditional approach to tribal criminal jurisdiction, which Congress has historically limited, and its approach to tribal civil jurisdiction, which it has not so limited. See Nat’l Farmers, 471 U.S. at 854-55, 105 S.Ct. 2447.
Supreme Court precedent prior to Hicks thus indicated that tribes generally have civil but not criminal adjudicative jurisdiction over nonmember conduct on tribal land.
2.
By contrast, the Supreme Court has held that a tribe does not possess any inherent sovereign right to regulate nonmembers on non-tribal land, even if the land falls within the boundaries of a reservation. For nonmember conduct on non-tribal land, therefore, the Supreme Court has applied a different framework for analyzing the scope of tribal adjudicative authority.
In Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the Court held that the Crow Tribe did not have the sovereign right to regulate nonmember fishing and hunting on land that was within the boundaries of the Crow Reservation but was owned by nonmembers (commonly referred to as “non-Indian fee land” or “fee land”). See id. at 563-67, 101 S.Ct. 1245. The Court then set forth two exceptions to this general rule. First, “[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.” Id. at 565, 101 S.Ct. 1245. Second, “[a] tribe may ... retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.” Id. at 566, 101 S.Ct. 1245.
The Court analyzed both exceptions and found that neither was satisfied on the *901 facts presented. See id. at 566, 101 S.Ct. 1245. Thus, the Tribe did not have the right to regulate nonmember fishing or hunting on fee land. Instead, the Tribe could prohibit or regulate fishing or hunting by nonmembers only on tribal land vrithin the reservation, “land on which the Tribe exercises ‘absolute and undisturbed use and occupation.’ ”[7] Id. at 559, 101 S.Ct. 1245 (quoting Second Treaty of Fort Laramie, Crow Indians-U.S., May 7, 1868, 15 Stat. 649, 650).
As the Supreme Court has summarized, then, “tribes retain considerable control over nonmember conduct on tribal land.” Strate, 520 U.S. at 454, 117 S.Ct. 1404 (emphasis added). “[W]ith respect to non-Indian fee lands,” however, “[s]ubjeet to controlling provisions in treaties and statutes, and the two exceptions identified in Montana, the civil authority of Indian tribes and their courts ... generally ‘does not extend to the activities of nonmembers of the tribe.’ ”[8] Id. at 453, 117 S.Ct. 1404 (alteration omitted) (emphasis added) (quoting Montana, 450 U.S. at 565, 101 S.Ct. 1245).
B.
In Hicks, the Supreme Court modified this general framework to what our court has understood to be a limited extent.
The jurisdictional question in Hicks arose after state game wardens executed a search warrant on tribal land at the home of a tribal member suspected of committing a crime outside the reservation. See Hicks, 533 U.S. at 356, 121 S.Ct. 2304. The suspect alleged that his property was damaged during the search and asserted civil rights claims against the state game wardens in tribal court. See id. at 356-57, 121 S.Ct 2304.
To resolve whether the tribal court had jurisdiction, the Supreme Court examined “the principle that Indians have the right to make their own laws and be governed by them[, which] requires ‘an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other.’ ” Id. at 362, 121 S.Ct. 2304 (quoting Washington v. Confederated Tribes of Colville Reservation, 447 U.S. 134, 156, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980)). The Court explained that “tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations — to the right to make laws and be ruled by them.” Id. at 364, 121 S.Ct. 2304 (internal quotation marks omitted). The Court reasoned that, by contrast, “[t]he State’s interest in *902 execution of process is considerable.” Id. Accordingly, the Court concluded that the tribal court lacked jurisdiction, even though the events giving rise to the claim had transpired on tribal land. See id. at 374, 121 S.Ct. 2304.
The Supreme. Court recognized in Hicks that its earlier cases suggested that tribal jurisdiction over civil suits depended on land ownership, but the Court stated that “[t]he ownership status of land, ... is only one factor to consider in determining whether regulation of the activities of nonmembers is ‘necessary to protect tribal self-government or to control internal relations.’ ” Id. at 360, 121 S.Ct. 2304 (quoting Montana, 450 U.S. at 564, 101 S.Ct. 1245). The Court reaffirmed, however, that the ownership status of land is a “significant” factor, id. at 370, 121 S.Ct. 2304, that “may sometimes be ... dispositive,” id.
Although the Court further suggested in Hicks that “the general rule of Montana applies to both Indian and non-Indian land,” id. at 360, 121 S.Ct. 2304, it also stated in a footnote: “Our holding in this case is limited to the question of tribal-court jurisdiction over state officers enforcing state law. We leave open the question of tribal-court jurisdiction over nonmember defendants in general.” Id. at 358 n.2, 121 S.Ct. 2304.
C.
, Although the Districts and the dissent would have us read Hicks to eliminate the right-to-exclude framework, our court has repeatedly rejected this interpretation. We have held that “Hicks is best understood as the narrow decision it explicitly claims to be,” and w;e have emphasized that Hicks’s “application of Montana to a jurisdictional question arising on tribal land should apply only when the specific concerns at issue in [Hicks] exist.” Water Wheel, 642 F.3d at 813. When other concerns have been present in civil cases involving nonmember conduct on tribal land, we have held that tribal courts have jurisdiction unless a treaty or federal statute provides otherwise — regardless of whether the Montana exceptions would be satisfied.
In McDonald v. Means, 309 F.3d 530 (9th Cir. 2002), for example, we held that a tribal court had jurisdiction over a tort suit arising from an accident on a road within a reservation because it was a tribal road— even though neither Montana exception applied. See id. at 535-40, 536 n.2. We explained that Hicks did not preclude jurisdiction because its holding was limited to “the question of tribal-court jurisdiction over state officers enforcing state law.” Id. at 540 (quoting Hicks, 533 U.S. at 358 n.2, 121 S.Ct. 2304). In doing so, we explicitly rejected the argument that Hicks modified or overruled Montana such that it would “bar tribal jurisdiction not only over the conduct of nonmembers on non-Indian fee land but on tribal land as well.” Id. at 540 n.9.
Similarly, in Water Wheel Camp Recreational Area, Inc. v. LaRance, 642 F.3d 802 (9th Cir. 2011), we reaffirmed that narrow interpretation of Hicks. We held that the Tribe’s right to exclude implied tribal civil jurisdiction over an eviction proceeding that arose after a nonmember, private lessee of tribal land failed to pay rent. Id. at 805-06, 812-13. We explained that the Montana framework was inapplicable because the conduct at issue occurred on tribal land. Id. at 809-14. We also reiterated that Hicks is limited to situations in which “the specific concerns at issue in that case exist.”[9] Id. at 813.
*903 We again adhered to our narrow reading of Hicks in Grand Canyon Skywalk Development, LLC v. ‘Sa’ Nyu Wa Inc., 715 F.3d 1196 (9th Cir. 2013). We held that tribal jurisdiction was not plainly lacking over a property and contract dispute involving a company that was operating a tourist attraction on tribal land. See id. at 1199, 1205. We held instead that the right-to-exclude framework applied because the dispute arose on tribal land, and we characterized Montana as “considering] tribal jurisdiction over nonmember activities on non-Indian land, held in fee simple, within a reservation.” Id. at 1205. Given the lack of any “obvious state interests at play” we concluded that, “[a]t the very least, it [could] not be said that the tribal court plainly lack[ed] jurisdiction” under Hicks.[10] Id. We therefore held that exhaustion of tribal remedies was required. See id. at 1200-01.
Our precedent thus makes clear that the right-to-exclude framework survives the narrow carve out effected by Hicks.[11]
*904 V.
Tribal jurisdiction is plausible in this case because (a) the schools operated by the Districts are located on tribal land over which the Navajo Nation maintains the right to exclude, and (b) state criminal law enforcement interests are not present here. We need not decide whether Hicks could be expanded to cover state interests other than those in criminal law enforcement because the only issue here is whether jurisdiction is colorable or plausible under our current precedent.
A.
The 1868 treaty that established the Navajo Reservation makes clear that the Navajo Nation has the right to exclude nonmembers from the land on which the Districts’ schools are now located. Article II of the treaty defines the reservation’s boundaries and contains an “exclusion” clause:
[T]he United States agrees that no persons except those herein so authorized to do, and except such officers, soldiers, agents, and employe[e]s of the government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article.
Treaty between the United States of America and the Navajo Tribe of Indians, Navajo Tribe of Indians-U.S., art. II, June 1, 1868, 15 Stat. 667. In Article VI of the treaty, the Navajo tribe agreed “to compel their children ... to attend school,” and the United States committed to providing teachers who would “reside among” the' tribe. Although this provision suggests that the Navajo Nation may have waived its right to exclude federal teachers and schools, it says nothing about the Navajo Nation’s authority to exclude state officials.[12]
Indeed, interpreting that treaty in a case involving Arizona’s right to tax Navajo tribe members on tribal land, the Supreme Court held that “it cannot be doubted that the reservation of certain lands for the ... Navajos and the exclusion of non-Navajos from ... [those lands] was meant to establish the lands as within the exclusive sovereignty of the Navajos.” McClanahan v. State Tax Comm’n of Ariz., 411 U.S. 164, 174-75, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). Absent explicit congressional action to modify or eliminate tribal rights granted by a treaty, those rights remain. See South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 343, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998) (“Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights. Accordingly, only Congress can alter the terms of an Indian treaty by diminishing a reservation, and its intent to do so must be ‘clear and plain.’ ” (citations omitted) (quoting United States v. Dion, 476 U.S. 734, 738-39, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986))).
Thus, as the treaty makes clear, the land at issue here is “within the exclusive sover *905 eignty of the Navajos,” and from this sovereignty, regulatory and adjudicative authority follow. See Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 144-45, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982); Strate v. A-1 Contractors, 520 U.S. 438, 453, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997).
The Districts argue, however, that the treaty is not broad enough to support jurisdiction over state school districts. Instead, according to the Districts, the treaty protects only the Navajo Nation’s authority over tribal lands and internal affairs. But it is at least plausible that the Tribe has adjudicative jurisdiction here because the conduct occurred on tribal land, where the Navajo Nation has the right to exclude. See McClanahan, 411 U.S. at 174, 93 S.Ct. 1257 (“[Tjhis Court in interpreting Indian treaties, [has] adopt[ed] .the general rule that ‘[djoubtful expressions are to be resolved in favor of [the Tribe].”’ (third alteration in original) (quoting Carpenter v. Shaw, 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930))).
The Districts next argue that whatever rights the treaty originally preserved for the Navajo Nation, Congress eliminated the Nation’s right to exclude, and thus its regulatory and adjudicative authority, by enacting the New Mexico-Arizona Enabling Act (the “Enabling Act”), ch. 310, 36 Stat. 557 (1910). The Enabling Act authorized the creation of the State of Arizona, and it required, as a condition of admission to the United States, the adoption of a constitution requiring the establishment and maintenance of a public school system. Id. at 570. It also specifically mandated that “the schools, colleges, and universities provided for in this Act shall forever remain under the exclusive control of the said State.” Id. at 573-74. The Districts argue that, under this congressional enactment, even schools located on tribal land must remain under the exclusive control of the State, including for purposes of adjudicative jurisdiction. But “courts will not lightly assume that Congress in fact intends to undermine Indian self-government.” Michigan v. Bay Mills Indian Cmty., — U.S. -, 134 S.Ct. 2024, 2032, 188 L.Ed.2d 1071 (2014). And nothing in the Enabling Act specifically addresses state schools on tribal land. In fact, the Enabling Act required Arizona, as a condition of admission, to disclaim any right to tribal land within its boundaries. See 36 Stat. at 569. Thus there are at least color-able arguments on both sides of the question whether the Enabling Act eliminated the Nation’s right to exclude. The Districts’ argument is therefore not strong enough to render tribal jurisdiction implausible.
The Districts further argue that Congress abrogated the treaty when it authorized, with the Navajo Nation’s consent, enforcement of state compulsory school attendance laws. But this argument likewise fails to demonstrate that tribal jurisdiction is clearly lacking. It is true that Congress authorized state officials to enter tribal land for the limited purpose of enforcing compulsory school attendance laws, and that the Navajo Nation consented to the enforcement on tribal land of such laws. See Act of Feb. 15, 1929, ch. 216, 45 Stat. 1185; Act of Aug. 9, 1946, ch. 930, 60 Stat. 962 (amending the Act of Feb. 15, 1929); 10 Navajo Nation Code § 503. But, beyond officers enforcing truancy laws, such authorization and consent do not abrogate the right to exclude state public schools *906 and their employees more generally — or the regulatory and adjudicative jurisdiction attendant to that right. Indeed, the fact that the Districts had to sign leases with the Navajo Nation to operate schools on Navajo land suggests that the Navajo Nation maintains the right to exclude state schools.
Furthermore, the leases themselves cannot be understood as a surrender of tribal jurisdiction. “[U]nless expressly waived ‘in unmistakable terms’ within [a] contract, a tribe retains its inherent sovereignty, and as such, the tribe may have jurisdiction.” Grand Canyon Skywalk Dev., LLC v. ‘Sa’ Nyu Wa Inc., 715 F.3d 1196, 1205 (9th Cir. 2013) (quoting Merrion, 455 U.S. at 148, 102 S.Ct. 894). Neither lease “expressly waive[s] in unmistakable terms” tribal jurisdiction. Window Rock’s lease requires the school district, to abide by Navajo laws, to the extent that they do not conflict with Arizona or federal law, and it further provides that the agreement to abide by Navajo laws does not forfeit any rights under state or federal laws. Pinon’s lease does not mention Navajo law or jurisdiction. At most, the Window Rock and Pinon leases are ambiguous as to their effect on tribal jurisdiction, which leads us to conclude that tribal jurisdiction is not plainly lacking.[13]
B.
The Districts argue in the alternative that Arizona’s interest in this case is important enough that Hicks applies to deprive the tribal courts of jurisdiction. But as discussed above, our court has taken Hicks at its word that its “holding ... is limited to the question of tribal-court jurisdiction over state officers enforcing state law.” Nevada v. Hicks, 533 U.S. 353, 358 n.2, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). Because “the specific concerns at issue in that case,” Water Wheel Camp Recreational Area, Inc. v. LaRance, 642 F.3d 802, 813 (9th Cir. 2011), are not present here, it is at least plausible that tribal jurisdiction exists. Exhaustion is therefore required.
Our conclusion is bolstered by National Farmers Union Insurance Cos. v. Crow Tribe of Indians, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). There, a tribal member student was injured at a school on state land within the boundaries of an Indian reservation. Id. at 847, 105 S.Ct. 2447. The Supreme Court required tribal court exhaustion in the resulting tort suit. See id. at 847, 856-57, 105 S.Ct. 2447. This case arguably presents even stronger reasons to require tribal court exhaustion, because, unlike the school in National Farmers, the schools operated by the Districts are located on tribal land, not state-owned land.
In sum, because the conduct at issue here occurred on tribal land over which the Navajo Nation has the right to exclude nonmembers, and because state criminal law enforcement interests are not present, we hold that tribal jurisdiction is at least colorable or plausible and that exhaustion in the tribal forum is therefore required.
CONCLUSION
For the foregoing reasons, we REVERSE the grant of summary judgment *907 and REMAND to the district court with instructions to DISSOLVE the injunction and DISMISS the case for failure to exhaust.

. Most of the Employees are members of the Navajo Nation.

. The dissent discusses the merits of the Employees' claims. But the Districts asked the district court to enjoin the tribal proceedings on the ground that "the Navajo tribal courts lack jurisdiction over public school districts’ employment decisions and practices conducted on the Navajo Reservation, when the Districts are fulfilling their state responsibilities to provide education for all Arizona citizens,” and the district court entered the requested injunction after agreeing as a matter of law with that broad legal principle, without discussing the merits of any particular employee's claim. Similarly, in defending the district court's judgment on appeal, the Districts argue that “[t]he facts material to the jurisdictional issue are (1) the status of the [school districts] as non-Indians — i.e., Arizona political subdivisions who were haled into tribal court as defendants; and (2) the fact that the [school] districts' conduct at issue — employment decisions made in the scope of their constitutional obligation to provide a general and uniform public school system- — -is not connected to tribal lands.” (citations omitted). Even if we were to consider the merits issues raised by the dissent and agreed that some of the employees’ claims should likely fail, the dissent offers no reason to believe that Michael Coonsis's claim lacks merit. So, even assuming a merits evaluation were relevant to the exhaustion question, there exists no merits-based justification for dismissing the entire consolidated action.

. The dissent criticizes us for not explaining why the policy purposes the Supreme Court set forth in National Farmers favor exhaustion in this case. But those policy purposes reflect a respect for the sovereignty of tribes and are therefore not dependent on the particular facts of any case. That is why we have held that exhaustion is always required unless certain limited circumstances are present. See Elliott v. White Mountain Apache Tribal Court, 566 F.3d 842, 847 (9th Cir. 2009).

. Because we hold that jurisdiction is color-able under the right-to-exclude framework, we need not reach Appellants’ arguments about the second framework. '

. Whether a tribe’s adjudicative jurisdiction equals its legislative jurisdiction remains an open question. See Hicks, 533 U.S. at 358, 121 S.Ct. 2304; Philip Morris USA, Inc. v. King Mountain Tobacco Co., 569 F.3d 932, 940 (9th Cir. 2009) (”[I]t is unclear whether ... tribal adjudicative jurisdiction extends to the boundary of tribal legislative jurisdiction.”).

. The decision in Oliphant that tribal courts lack criminal jurisdiction over non-Indians was based partly on the Supreme Court’s conclusion that relevant legislation and treaties at the time required this outcome. 435 U.S. at 203-08, 98 S.Ct. 1011. Since Oliphant, Congress has expanded tribal jurisdiction to criminal cases involving nonmember Indians' conduct on tribal land, see United States v. Lara, 541 U.S. 193, 196, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004) (citing 25 U.S.C. § 1301(2)), and it has authorized tribal courts "to ‘exercise special domestic violence criminal jurisdiction’ over certain domestic violence offenses committed by a non-Indian against an Indian,” United States v. Bryant, - U.S. -, 136 S.Ct. 1954, 1960 n.4, 195 L.Ed.2d 317 (2016) (quoting 25 U.S.C. § 1304). Nevertheless, it remains true that "[t]ribal governments generally lack criminal jurisdiction over non-Indians who commit crimes in Indian country.” Id. (citing Oliphant, 435 U.S. at 195, 98 S.Ct. 1011).

. We note one apparent inconsistency in the Supreme Court’s caselaw. Although National Farmers post-dated Montana, and although the conduct at issue in National Farmers' — • like that in Montana — took place on non-tribal land within the boundaries of a reservation, the Supreme Court in National Farmers did not analyze the question of jurisdiction pursuant to Montana. Instead, the Court stated that “the existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions,” and that this "examination should be conducted in the first instance in the Tribal Court itself.” Nat’l Farmers, 471 U.S. at 855-56, 105 S.Ct. 2447 (footnote omitted).

. The dissent suggests that Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008), demonstrates that the Montana exceptions should govern the jurisdictional question in this case. But Plains Commerce Bank involved “a non-Indian’s sale of non-Indian fee land,” id. at 330, 128 S.Ct. 2709, and thus does not control this case, in which the conduct at issue occurred on tribal land.

. Although our decision in Philip Morris USA, Inc. v. King Mountain Tobacco Co., 569 F.3d *903 932 (9th Cir. 2009), could arguably be read to extend the Montana framework more broadly, we explained in Water Wheel that “Philip Morris's comments regarding jurisdiction are best understood as a reiteration of the Supreme Court’s rule that a tribe’s adjudicative jurisdiction may not exceed its regulatory jurisdiction.” 642 F.3d at 815. "Furthermore,” we continued, “Philip Morris did not involve a question related to the tribe’s authority to exclude or its interest in managing its own land. To the contrary, the activity in question occurred off reservation.” Id. Similarly, although Smith v. Salish Kootenai College, 434 F.3d 1127 (9th Cir. 2006) (en banc), could arguably be read to extend the Montana framework, the jurisdictional question in Smith arose in a different context from the one presented here. In Smith, a nonmember challenged a tribal court’s authority to adjudicate a claim that he had filed as a plaintiff in tribal court. Id. at 1128, 1133. We held that by filing the claim, the nonmember had consented to tribal jurisdiction. Id. at 1136. By contrast, nonmember defendants — not plaintiffs — challenge the tribal forum's jurisdiction in this case.

. The dissent here describes Water Wheel and Grand Canyon as ”acknowledge[ing] that Hicks requires application of the Montana framework when there are 'competing state interests at play.’ ” In fact, in both cases we identified the lack of competing state interests as' a reason why the Montana framework did not apply, Grand Canyon, 715 F.3d at 1205; Water Wheel, 642 F.3d at 805, but we did not say that the presence of competing state interests — whatever their nature — would automatically cause Montana to apply. Indeed, in Grand Canyon, we stated that "when a competing state interest exists courts balance that interest against the tribe’s” to determine whether there is tribal jurisdiction. 715 F.3d at 1205. Here, the tribal tribunal had ordered discovery on the nature of the tribal and state interests at stake, but the district court enjoined the tribal proceedings before that discovery or any hearing about it could occur. We thus do not know the full contours of the tribal and state interests at stake, including whether or how, as the dissent contends, Arizona’s "interest in complying with a statutory and constitutional directive to provide a uniform system of public education to all the State’s children” is implicated by the individual employment disputes in this case. Indeed, the parties dispute whether the Districts are traditional school districts controlled by state or local government, or whether they are "special-purpose governments with a separately elected governing body” that are "legally separate, and fiscally independent of other state and local governments,” and thus dispute how directly the State's policies are involved. Nor do we know how the tribal tribunal would have balanced the interests at stake here if exhaustion had run its course.

. The dissent apparently disagrees with our precedents in this area. But we as a three-judge panel are bound by those precedents absent an intervening irreconcilable Supreme Court decision. See Miller v. Gammie, 335 F.3d 889, 892-93 (9th Cir. 2003) (en banc). The dissent points to no such Supreme Court decision. Indeed, every Supreme Court case that the dissent discusses was decided before Water Wheel and Grand Canyon and thus cannot be described as an intervening decision. The dissent refers without citation to "all existing authority” that establishes that when "there are competing state interests at stake, *904 tribal jurisdiction over nonmembers only exists if at least one of the two Montana exceptions is satisfied.” We are unaware of any such authority from our court or the Supreme Court.

. The dissent states that Arizona “became subject to the Treaty’s specific requirement of government schools on Indian land” without citing any authority for that proposition. As discussed infra, the Enabling Act required Arizona to establish a system of public education, but it said nothing about Arizona taking over the federal government’s treaty relationship with the Navajo, as the dissent seems to suggest.

. Although the employment contracts of two employees state that jurisdiction for matters arising out of the contract lie with Arizona state courts and federal courts, most of the contracts provided only that the employees agreed to abide by state and federal law and were silent as to the laws that would govern-the contractual relationship and as to where disputes about the employment relationship would be litigated. Most of the contracts, including Michael Coonsis’s, see ri.2 supra, lack any provisions that even arguably bear on the tribal jurisdiction question.