**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| DUANNA KNIGHTON, *Plaintiff-Appellant*, | No. 17-15515 |
| v. | D.C. No. 2:16-cv-02438-WHO |
| CEDARVILLE RANCHERIA OF NORTHERN PAIUTE INDIANS; CEDARVILLE RANCHERIA TRIBAL COURT; PATRICIA R. LENZI, in her capacity as Chief Judge of the Cedarville Rancheria Tribal Court, *Defendants-Appellees.* | ORDER AND OPINION |

Appeal from the United States District Court
for the Eastern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted November 16, 2018
San Francisco, California

Filed April 24, 2019

Before: A. Wallace Tashima and Milan D. Smith, Jr.,
Circuit Judges, and Lawrence L. Piersol,[*] District Judge.

Opinion by Judge Piersol

---

[*] The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota, sitting by designation.

## SUMMARY[**]

### Tribal Jurisdiction

The panel filed (1) an order granting a petition for panel rehearing and withdrawing its opinion filed March 13, 2019; and (2) a superseding opinion affirming the district court's dismissal of an action challenging a tribe's subject matter jurisdiction over tort claims brought by the tribe against a nonmember employee.

The tort claims arose from conduct committed by the nonmember on tribal lands during the scope of her employment. At issue was whether the tribal court had jurisdiction to adjudicate tribal claims against its nonmember employee, where the tribe's personnel policies and procedures manual regulated the nonmember's conduct at issue and provided that the tribal council would address violations by the nonmember during the course of her employment, and the tribal court and tribal judicial code were established and enacted after the nonmember left her employment with the tribe.

The panel held that a tribe's regulatory power over nonmembers on tribal land derives both from the tribe's inherent sovereign power to exclude nonmembers from tribal land and from the tribe's inherent sovereign power to protect self-government and control internal relations.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the tribe had authority to regulate the nonmember employee's conduct at issue pursuant to its sovereign exclusionary power. Alternatively, the tribe had regulatory authority under both *Montana* exceptions, which allow a tribe (1) to regulate the activities of nonmembers who enter consensual relationships with the tribe or its members and (2) to exercise civil authority over the conduct of nonmembers on fee lands within its reservation when that conduct threatens or directly affects the political integrity, the economic security, or the health or welfare of the tribe. The panel concluded that the tribe's personnel manual regulated the employee's conduct, and the fact that the tribe later sought to adjudicate its claims in tribal court did not undermine the tribal court's jurisdiction. Given the existence of regulatory authority, the sovereign interests at stake, and the congressional interest in promoting self-government, the tribal court had jurisdiction over the tribe's tort claims.

## COUNSEL

Patrick L. Deedon (argued), Maire & Deedon, Redding, California, for Plaintiff-Appellant.

Jack Duran, Jr., Esq. (argued), Duran Law Office, Roseville, California, for Defendants-Appellees.

**ORDER**

Plaintiff-Appellant's petition for panel rehearing is
**GRANTED**.   The opinion filed March 13, 2019, and
reported at 918 F.3d 660, is hereby withdrawn.   A
superseding opinion will be filed concurrently with this
order.

**OPINION**

PIERSOL, Senior District Judge:

This case concerns the sources and scope of an Indian
tribe's jurisdiction over tort claims brought by the tribe
against a nonmember employed by the tribe.  The tort claims
arose from conduct committed by the nonmember on tribal
lands during the scope of her employment.  The question
presented is whether the tribal court has jurisdiction to
adjudicate tribal claims against its nonmember employee,
where the tribe's personnel policies and procedures manual
regulated the nonmember's conduct at issue and provided
that the tribal council would address violations by the
nonmember during the course of her employment, and the
tribal court and tribal judicial code were established and
enacted after the nonmember left her employment with the
tribe.

We previously held that a tribe's inherent sovereign
power to exclude nonmembers from tribal land is an
independent source of regulatory power over nonmember
conduct on tribal land. *See Water Wheel Camp Recreational
Area, Inc. v. LaRance*, 642 F.3d 802, 814 (9th Cir. 2011) (per
curiam) (stating that where the nonmember activity occurred
on tribal land, and when there are no competing state

interests at play, "the tribe's status as landowner is enough to support regulatory jurisdiction without considering *Montana* [*v. United States*, 450 U.S. 544 (1981)]").  Today we also observe that a tribe's regulatory power over nonmembers on tribal land does not solely derive from an Indian tribe's exclusionary power, but also derives separately from its inherent sovereign power to protect self-government and control internal relations.  *See Montana*, 450 U.S. at 564 (stating that Indian tribes retain their inherent sovereign power to protect tribal self-government and to control internal relations); *see also Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144–45 (1982) (holding that the tribe's authority to tax nonmember mining and drilling on tribal land derived from its inherent power to govern and pay for the costs of self-government and stating that such regulations were also within the tribe's inherent power to condition the continued presence of nonmembers on tribal land).

Accordingly, we now hold that under the circumstances presented here, the tribe has authority to regulate the nonmember employee's conduct at issue pursuant to its inherent power to exclude nonmembers from tribal lands. We also hold, in the alternative, that the tribe has regulatory authority over the nonmember employee's conduct under both *Montana* exceptions.  Given the existence of regulatory authority, the sovereign interests at stake, and the congressional interest in promoting tribal self-government, we conclude that the tribal court has jurisdiction over the tribe's claims in this case.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Factual Background

The facts as presented and analyzed here are based on the allegations included in the original complaint filed in tribal court, and not upon the conclusions of a fact finder.

#### A.  The Cedarville Rancheria Tribe

The Cedarville Rancheria of Northern Paiute Indians ("the Tribe") is a federally recognized Indian tribe that has approximately twelve voting members and operates a 17-acre Rancheria in Cedarville, California ("the Rancheria"). The Rancheria is held in trust for the Tribe by the United States government. During the latter part of events at issue in this case, the Tribe's administrative offices were relocated from the Rancheria to land held in fee[1] by the Tribe in Alturas, California.

The Tribe's governing body is the Community Council, which is composed of all qualified voters of the Rancheria who are 18 years of age or older. Every three years, the Community Council elects three of its members to serve on the Executive Committee—the Tribal Chairperson, Vice Chairperson, and Secretary. The Executive Committee enforces the Community Council's ordinances and other enactments and represents the Tribe in negotiations with tribal, federal, state, and local governments.

---

[1] Pending with the Bureau of Indian Affairs is a petition by the Tribe to place the property on which the Tribe's administrative offices are now located in trust with the United States government.

## B.  Knighton's Employment with the Tribe

Duanna Knighton ("Knighton") was employed by the Tribe from July 1996 until she resigned in March 2013. Knighton is not a member of the Tribe and had never resided on or owned land within the Rancheria.  At the time of her resignation, Knighton's position was that of Tribal Administrator.  As Tribal Administrator, she oversaw the day-to-day management of the Rancheria, its personnel, and many aspects of its finances.

During Knighton's employment, the Tribe regulated its employees pursuant to the Cedarville Rancheria Personnel Policies and Procedures Manual ("the Personnel Manual"). The Personnel Manual regulated employee conduct including, but not limited to: misfeasance and malfeasance in the performance of duty, incompetency in the performance of job duties, theft, carelessness or negligence with the monies or property of the Rancheria, inducement of an employee to act in violation of Rancheria regulations, and violation of personnel rules.  Disciplinary actions for an employee's breach of rules and standards of conduct in the course of employment specified in the Personnel Manual included a verbal warning, written reprimand, suspension without pay, demotion, and involuntary termination.

The Personnel Manual provided that where the Tribal Administrator was the subject of disciplinary action, the Community Council directly oversaw the disciplinary process.

## C.  Knighton's Employment with RISE

From 2009 until at least 2016, in addition to her position as Tribal Administrator, Knighton was also serving as an employee or officer of Resources for Student Education

("RISE"), a California nonprofit, that provides education services and programs to Indian children. RISE is not a tribally created or licensed business entity, and it receives the majority of its funding from state and federal grants and private donations.

## D.  The Tribe's Purchase of RISE Property

In mid-2009, Knighton, acting in her capacity as Tribal Administrator, negotiated the Tribe's purchase from RISE of a building in Alturas, California, where the Tribe's administrative offices are now located. During this time, Knighton was also an employee or agent of RISE.

Knighton initially recommended that the Tribe purchase the building for $350,000, allegedly representing that such a price was below market value even though she had not received a professional appraisal of the property. The Tribe later discovered that the $350,000 purchase price recommended by Knighton was $200,000 above market value. Knighton also represented to the Tribe that it could pay off its building loan within five years after the purchase and that RISE would pay rent to the Tribe for its occupancy until the note on the building was paid off.

The Tribe asserts that at no time during the purchase negotiations did Knighton disclose she had a conflict of interest representing both RISE and the Tribe in the sale, that RISE was close to insolvency, or that she had an agreement with RISE to split the proceeds of the building sale. The parties settled on a purchase price of $300,000. Within twelve months of the sale, RISE moved its business operations out of the building.

**E.  Knighton's Resignation**

Before Knighton resigned in March 2013 as Tribal Administrator, she allegedly cashed out $29,925 in vacation and sick pay in violation of the Tribe's policies and procedures.  The Tribe issued a check in the amount of $29,925, payable to RISE on Knighton's behalf.  The Tribal Vice Chairman approved Knighton's request to cash out based on her representation that her request had been approved by the Tribal Chairperson, when in fact, the Tribal Chairperson had denied Knighton's request.

When Knighton resigned in March 2013, she took with her all files, including files belonging to the Tribe, room furnishings, and a computer, representing to the Tribe that the property removed belonged to RISE.

In late 2013, the Tribe wrote a letter to RISE demanding the return of the $29,925 and any and all tribal property, including the computer.  Both RISE and Knighton refused through their counsel to return the funds or any of the property.

**F.  Creation of Constitution, Tribal Judicial Code, and Tribal Court**

In February 2011, while Knighton was still employed by the Tribe, the Tribe's voting membership adopted the Constitution and Bylaws of the Cedarville Rancheria, which was approved by the Regional Director of the Bureau of Indian Affairs.  Article II of the Tribe's Constitution provides that the "jurisdiction of [the Tribe] shall extend to the land now within the confines of the [] Rancheria and to such other lands as may thereafter be added thereto."

In December 2013, nine months after Knighton's resignation, the Tribe enacted the Cedarville Rancheria Judicial Code ("the Tribal Judicial Code") and established the Cedarville Rancheria Tribal Court, which consists of a tribal court ("the Tribal Court") and a tribal court of appeals ("the Tribal Court of Appeals"). All judges must be lawyers experienced in the practice of tribal and federal Indian law and licensed to practice in the highest court of any state. Judges cannot be the Tribal Administrator, Assistant Clerks, or members of the Executive Committee. The Tribal Judicial Code provides that the Tribal Court and Tribal Court of Appeals have jurisdiction over all civil causes of action that arise within the boundaries of the Rancheria. Pursuant to the Tribal Judicial Code, the Tribal Court has the power to issue orders and judgments and to award limited money damages.

### G.  The Tribe's Audit Findings

In early 2014, after Knighton resigned, the Tribe conducted a forensic accounting of the Tribe's financial position. The Tribe alleges that the forensic accounting came about after the former Tribal Chairperson shot and killed four tribal members at an Executive Committee meeting on February 20, 2014. The slain Tribal Chairman was a vocal critic of Knighton's performance. He was among those killed by his sister. During this accounting, the Tribe reviewed its annual audit reports dating back to 2005 and found that the reports detailed several material weakness findings by the auditor. The auditor's findings noted major deficiencies in the accounting of the Tribe's finances, which Knighton oversaw, and noted that the Tribe had not adopted a policy regarding the investment of tribal funds. The Tribe also discovered that in 2008, an annual audit of the Tribe's finances showed that $3.07 million of the Tribe's money had

been invested by Knighton in high-risk investments, which had declined in value by more than $1.2 million by the end of 2008. The Tribe also discovered that tribal funds belonging to the Tribe's children had been co-mingled with funds invested on behalf of adults, resulting in improper taxation.

The Tribe asserts that the annual audit reports, and the material weakness findings and investment losses detailed therein, had not been provided by Knighton to the Tribe and were only discovered by the Tribe after Knighton's resignation.

## II. Procedural Background

The Tribe filed a complaint in the Tribal Court against Knighton, RISE, and Oppenheimer Funds, Inc.[2] The complaint included claims for fraud and deceit, recovery of unauthorized and excessive pension payments, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment, common count-account stated, and common count-money had and received. In support of its claims, the Tribe alleged that Knighton improperly manipulated the Tribe's policies and procedures to provide her salary and fringe benefits, including a pension in excess of what would normally be paid to a Tribal Administrator for a like-sized tribe. The Tribe also alleged that Knighton invested its money in high-risk investments without the appropriate authority, and attempted to enter financial agreements without appropriate authorization or waivers of tribal sovereign immunity.

---

[2] RISE and Oppenheimer Funds, Inc. are no longer parties in this lawsuit.

Knighton responded by filing a motion to dismiss, claiming, in relevant part, that the Tribal Court lacked subject matter jurisdiction under *Montana v. United States*.

The Tribal Court denied Knighton's motion to dismiss, finding that it had jurisdiction over the Tribe's claims against Knighton under both *Montana* exceptions because Knighton entered into a consensual relationship with the Tribe, by virtue of her employment with the Tribe, and because Knighton's conduct threatened or had a direct effect on the political integrity, economic security, and health and welfare of the Tribe. The Tribal Court's decision was affirmed by the Tribal Court of Appeals, but the case was remanded to the Tribal Court to determine whether RISE was an indispensable party to the suit, following a finding that the issue had not been raised in the Tribal Court.

On remand, pursuant to a stipulation between the parties, the Tribal Court stayed the case to allow Knighton to contest in federal district court the Tribal Court's jurisdiction over the Tribe's asserted claims. As a result of the stay, there is no Tribal Court exhaustion issue in this case.

Knighton filed a lawsuit in federal district court seeking, among other things, a declaratory judgment that the Tribal Court lacks subject matter jurisdiction over the Tribe's claims against Knighton under both *Montana* exceptions, and a permanent injunction against further proceedings in the Tribal Court. The defendants moved to dismiss Knighton's complaint on the basis that the Tribal Court's jurisdiction over the Tribe's claims was proper under both *Montana* exceptions.

The district court ruled that the Tribal Court has subject matter jurisdiction over the Tribe's claims, and granted defendants' motion to dismiss. The district court declined to

apply *Montana* in its jurisdictional analysis based on its finding that Knighton's alleged conduct occurred either on tribal land within the Rancheria's borders or was closely related to tribal land.  The district court stated that under *Water Wheel*, the *Montana* framework did not apply to jurisdictional issues involving nonmember conduct on tribal land.  The district court concluded that the Tribe had authority to regulate Knighton's conduct because "Knighton's employment activities directly affected the Tribe's inherent powers to protect the welfare of its members and preserve the integrity of its government" and because "her conduct threatened the Tribe's very economic survival," and held that the Tribal Court had jurisdiction to adjudicate the Tribe's claims.

Knighton appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291.  The question of tribal court jurisdiction is a question of federal law, which we review *de novo*, with factual findings reviewed for clear error.  *Smith v. Salish Kootenai Coll.*, 434 F.3d 1127, 1130 (9th Cir. 2006) (en banc).

## ANALYSIS

"To exercise its inherent civil authority over a defendant, a tribal court must have both subject matter jurisdiction—consisting of regulatory and adjudicative jurisdiction—and personal jurisdiction."  *Water Wheel*, 642 F.3d at 809.  At issue in this case is whether the Tribal Court has subject matter jurisdiction over the Tribe's claims against Knighton.

## I.  Regulatory Jurisdiction

### A.  Legal Precedent and This Case

"The sovereignty that the Indian tribes retain is of a unique and limited character.  It exists only at the sufferance of Congress and is subject to complete defeasance.  But until Congress acts, the tribes retain their existing sovereign powers."  *United States v. Wheeler*, 435 U.S. 313, 323 (1978).  "Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status."  *Id.*  In *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, the Court recognized  that "[t]he tribes also retain some of the inherent powers of the self-governing political communities that were formed long before Europeans first settled in North America."  471 U.S. 845, 851 (1985) (citing *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 55–56 (1978)).  The Court went on to say that under 28 U.S.C. § 1331, a federal court may determine "whether a tribal court has exceeded the lawful limits of its jurisdiction."  *Id.* at 853.  Thus, the outer boundaries of tribal court jurisdiction are a matter of federal common law.

We have noted that the Court has long recognized that as part of their residual sovereignty, tribes retain the inherent power to exclude nonmembers from tribal lands.  *See Water Wheel*, 642 F.3d at 808; *see also New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983) ("A tribe's power to exclude nonmembers entirely or to condition their presence on [tribal land] is [] well established.").  "From a tribe's inherent sovereign powers flow lesser powers, including the power to regulate [nonmembers] on tribal land."  *Water Wheel*, 642 F.3d at 808–09 (citing *South Dakota v. Bourland*, 508 U.S. 679, 689 (1993)).

The Court has made clear, however, "that once tribal land is converted into fee simple [land], the tribe loses plenary jurisdiction over it . . . . As a general rule, then 'the tribe has no authority itself, by way of tribal ordinance or actions in the tribal courts, to regulate the use of fee land.'" *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 328–29 (2008) (quoting *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 430 (1989) (plurality opinion)). In *Montana v. United States*, the Court recognized two exceptions to this general rule. First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565. Second, a tribe may exercise civil authority over the conduct of nonmembers on fee lands within its reservation when "that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566.

"Since deciding *Montana*, the Supreme Court has applied those exceptions almost exclusively to questions of jurisdiction arising on [non-tribal] land." *Water Wheel*, 642 F.3d at 809. The exception is *Nevada v. Hicks*, 533 U.S. 353 (2001). *Water Wheel*, 642 F.3d at 809. In *Hicks*, the Court addressed a tribal court's jurisdiction over claims against state officers arising from the execution of a search warrant on tribal land for alleged violations of state poaching laws—specifically, the killing of bighorn sheep off the reservation. 533 U.S. at 356–57. Both the state court and then the tribal court issued search warrants. *Id.* at 356. The Court stated that although ownership status of the land "may sometimes be a dispositive factor" in determining a tribe's authority to regulate nonmember activity on tribal land, the

tribe's power to exclude nonmembers from tribal land was "not alone enough to support" the tribe's regulatory jurisdiction over the state officers' activities when the state had a competing interest in executing a warrant for an off-reservation crime.  *Id.* at 360.  The Court applied *Montana* and concluded that "tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations" while "[t]he State's interest in execution of process is considerable."  *Id.* at 364.

Although some jurisdictions have interpreted *Hicks* as eliminating the right-to-exclude framework as an independent source of regulatory power over nonmember conduct on tribal land, we have declined to do so.  In *Water Wheel*, we observed that *Hicks* "expressly limited its holding to 'the question of tribal-court jurisdiction over state officers enforcing state law.'"   *Water Wheel*, 642 F.3d at 813 (quoting *Hicks*, 533 U.S. at 358 n.2).  Indeed, the *Hicks* Court specifically "le[ft] open the question of tribal-court jurisdiction over nonmember defendants in general."  *Hicks*, 533 U.S. at 358 n.2.  In *Water Wheel*, we held that a "tribe's status as landowner is enough to support regulatory jurisdiction" except "when the specific concerns at issue [in *Hicks*] exist."   642 F.3d at 813.  "Doing otherwise would impermissibly broaden *Montana*'s scope beyond what any precedent requires and restrain tribal sovereign authority despite Congress's clearly stated federal interest in promoting tribal self-government."  *Id.* at 813.

In *Hicks*, the defendants were state officers enforcing a state-court-issued search warrant, so there was a significant state interest at stake.  By contrast, the present case involves a private, consensual employment relationship between Knighton and the Tribe, which occurred primarily on tribal

land.  There are no significant competing state interests, as in *Hicks*.  Accordingly, our *Water Wheel* precedent compels the conclusion that the Tribe possesses regulatory jurisdiction over its claims against Knighton.

Since *Hicks*'s limited holding, the Court in *Plains Commerce Bank* held that a tribal court did not have jurisdiction to adjudicate a discrimination claim concerning a non-Indian defendant's sale of fee land.  *Plains Commerce Bank*, 554 U.S. at 323, 340–41.  The land in question was sold as part of the 1908 Allotment Act and was owned by a non-Indian party for at least 50 years.  *Id.* at 331, 341.  The Court found that the discrimination law that the plaintiffs were attempting to enforce operated as a restraint on alienation and had the effect of regulating the substantive terms on which the non-Indian bank was able to offer its fee land for sale.  *Id.* at 331.  The Court stated that while "*Montana* and its progeny permit tribal regulation of nonmember *conduct* inside the reservation that implicates the tribe's sovereign interests," that case "does not permit Indian tribes to regulate the sale of non-Indian fee land," as neither of the *Montana* exceptions applies.  *Id.* at 332.  By contrast, in the present case the nonmember defendant *while on tribal land* allegedly used her position as Tribal Administrator to violate the terms of her employment in a wide variety of ways that were significantly detrimental to the management and financial security of the Tribe.

## B.  Appellant's Arguments

Knighton argues that treating ownership status of the land as a dispositive factor in upholding a tribe's power to regulate nonmember conduct on tribal land (unless, as in *Hicks*, there are significant state interests present) is contrary to our prior rulings in *McDonald v. Means*, 309 F.3d 530 (9th Cir. 2002), and *Smith v. Salish Kootenai College*.  We

disagree. In *McDonald*, we specifically recognized that a tribe's jurisdiction over civil claims against nonmembers arising on tribal land is limited under *Hicks* only in cases where significant state interests are present. *See* 309 F.3d at 540. And in *Window Rock Unified School District v. Reeves*, 861 F.3d 894, 902 n.9 (9th Cir. 2017), we concluded that *Smith* did not limit a tribe's jurisdiction over civil claims against nonmembers bearing a direct connection to tribal land. We concluded that *Smith* was distinguishable because it involved a nonmember plaintiff, as opposed to a nonmember defendant, who had entered into a consensual relationship with the tribe by filing his action in tribal court. *Id.*

Knighton's argument that a tribe's regulatory power over nonmember conduct on tribal land is limited to conduct that directly interferes with a tribe's inherent powers to exclude and manage its own lands is also unavailing. In *Window Rock*, we concluded that the tribal court's jurisdiction over employment-related claims that did not involve access to tribal land was plausible; accordingly, we held that the nonmember defendants were required to exhaust their tribal court remedies before proceeding in federal court. *Id.* at 896, 906. Moreover, limiting a tribe's regulatory power over nonmember conduct to that which directly interferes with a tribe's inherent powers to exclude and manage its own lands, as Knighton suggests, would restrict tribal sovereignty absent explicit authorization from Congress—an approach we specifically rejected in *Water Wheel*. *See* 642 F.3d at 812 (stating that the tribe's right to exclude nonmembers from tribal land includes the power to regulate them "unless Congress has said otherwise, or unless the Supreme Court has recognized that such power conflicts with federal interests promoting tribal self government").

Knighton also argues that under the facts of this case, *Water Wheel*'s right-to-exclude framework is inapplicable because some of her alleged misconduct occurred *off* tribal land, after the tribal administrative offices were relocated to fee land owned by the Tribe. Although the Tribe's complaint does not allege precisely where the conduct at issue occurred, most of the claims alleged against Knighton involve conduct that took place on tribal land, before the Tribe's administrative offices were moved in mid-2009 to the RISE building in Alturas, California. Moreover, the facts of this case are unique in that any claims that may have arisen outside tribal land are based on alleged misconduct and misrepresentations made by Knighton on tribal land. *See Smith*, 434 F.3d at 1135 (stating that jurisdictional inquiry is not limited to deciding precisely when and where the claim arose, but whether it bears some direct connection to tribal lands). For example, the $29,925 overpayment for unused vacation and sick leave that the Tribe seeks to recover stems from misrepresentations that Knighton allegedly made throughout the course of her employment, before the Tribe's administrative offices relocated. In addition, the relocation of the Tribe's administrative offices from tribal land to the RISE building on tribal fee land was allegedly due to misrepresentations by Knighton.

Knighton further argues that even if the Tribe had the power to regulate her conduct on tribal land during the course of her employment under *Water Wheel*'s right-to-exclude framework, the Tribe's authority is limited to the regulations that were in place during her employment—which is to say, those provided for in the Personnel Manual. Knighton contends that the Tribe is attempting to impose new regulations on her through tort law after she left her employment with the Tribe.

A tribe's power to exclude nonmembers from tribal lands permits a tribe to condition a nonmember's entry or continued presence on tribal land, *see Merrion*, 455 U.S. at 144–45, but this inherent power does not permit the Tribe to impose new regulations upon Knighton's conduct retroactively when she is no longer present on tribal land. However, we agree with the district court that Knighton's alleged conduct violated the Tribe's regulations that were in place at the time of her employment. The Personnel Manual regulated employee conduct including, but not limited to, misfeasance or malfeasance in the performance of duty, incompetency in the performance of job duties, theft, carelessness or negligence with the monies or property of the Rancheria, inducement of an employee to act in violation of Rancheria regulations, and violation of personnel rules—all conduct that forms the basis of the Tribe's claims against Knighton.

## C.  Sources of Authority

In *Water Wheel*, we concluded that a tribe's inherent sovereign power to exclude nonmembers from tribal land provides an independent basis upon which a tribe may regulate the conduct of nonmembers on tribal land. But, a tribe's power to exclude is not the only source of its regulatory authority over nonmembers on tribal land. *See Brendale*, 492 U.S. at 425 ("An Indian tribe's [] power to exclude nonmembers of the tribe from its lands is not the only source of Indian regulatory authority."). "[T]ribes have inherent sovereignty independent of that authority arising from their power to exclude." *Id.* (citing *Merrion*, 455 U.S. at 141); *see also Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 592 (9th Cir. 1983) ("The power to exercise tribal civil authority over [nonmembers] derives not only from the tribe's inherent powers necessary to self-

government and territorial management, but also from the power to exclude nonmembers from tribal land." (citing *Merrion*, 455 U.S. at 141–44)).

In addition to the power to exclude, we have the *Montana* Court's acknowledgment that Indian tribes retain their inherent sovereign power to protect tribal self-government and to control internal relations.  450 U.S. at 564.  "[I]n accordance with that right tribes 'may regulate nonmember behavior that implicates [these sovereign interests].'"  *Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d 927, 936 (8th Cir. 2010) (quoting *Plains Commerce Bank*, 554 U.S. at 335).

Subsequent to *Montana*, in *Merrion*, the Court affirmed that Indian tribes have inherent sovereign power to regulate nonmember conduct on tribal land independent of that authority arising from their power to exclude.  *Merrion*, 455 U.S. at 144.  The Court in *Merrion* concluded that a tribe's power to tax nonmember mining and drilling on tribal land derived from its inherent "power to govern and to pay for the costs of self-government," and concluded that such regulatory authority was also within the tribe's inherent power to condition the continued presence of nonmembers on tribal land.  *Id*. at 144–45.  These varied sources of tribal regulatory power over nonmember conduct on the reservation were affirmed by the Court in *Plains Commerce Bank*.  554 U.S. at 337 ("[T]he regulation must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations.").

While the district court believed that our caselaw prohibited the application of the *Montana* framework to tribal jurisdictional issues involving nonmember conduct on

tribal land, it also recognized that a tribe's regulatory power over nonmembers on tribal land does not solely derive from its power to set conditions on entry or continued presence. Accordingly, it concluded that the Tribe had regulatory jurisdiction over Knighton's conduct because "Knighton's employment activities directly affected the Tribe's inherent powers to protect the welfare of its members and preserve the integrity of its government," and because "her conduct threatened the Tribe's very economic survival."

We now clarify *Water Wheel* and our subsequent cases involving tribal jurisdictional issues on tribal land do not exclude *Montana* as a source of tribal regulatory authority over nonmember conduct on tribal land. Rather, our caselaw states that an Indian tribe has power to regulate nonmember conduct on tribal land incident to its sovereign power to exclude nonmembers from tribal land, regardless of whether either of the *Montana* exceptions is satisfied. *See Water Wheel*, 642 F.3d at 814 ("[T]he tribe's status as landowner is enough to support regulatory jurisdiction *without considering Montana.*" (emphasis added)); *Grand Canyon Skywalk Dev.*, *LLC v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1196, 1204 (9th Cir. 2013) ("[A] tribe's inherent authority over tribal land may provide for regulatory authority over [nonmembers] on that land *without the need to consider Montana*." (emphasis added)); *Window Rock*, 861 F.3d at 902 ("[I]n civil cases involving nonmember conduct on tribal land, we have held that tribal courts have jurisdiction unless a treaty or federal statute provides otherwise— *regardless of whether the Montana exceptions would be satisfied*." (emphasis added)). Certainly, as our caselaw has discussed at length, without evidence of a contrary intent by Congress, a tribe's power to regulate nonmember conduct on tribal land flows from its inherent power to exclude and is circumscribed only to the limited extent that the

circumstances in *Hicks*—significant state interests—are present. *See Water Wheel*, 642 F.3d at 813; *Grand Canyon*, 715 F.3d at 1205; *Window Rock*, 861 F.3d at 902. However, the Court has made clear that a tribe also has sovereign authority to regulate nonmember conduct on tribal lands independent of its authority to exclude if that conduct intrudes on a tribe's inherent sovereign power to preserve self-government or control internal relations. The *Montana* exceptions are "rooted" in the tribes' inherent power to regulate nonmember behavior that implicates these sovereign interests. *Attorney's Process*, 609 F.3d at 936 (citing *Plains Commerce Bank*, 554 U.S. at 335).

Accordingly, although we conclude that the Tribe had authority to regulate Knighton's conduct on tribal land pursuant to its sovereign exclusionary powers, a separate question remains as to whether the Tribe also had regulatory authority over Knighton's conduct pursuant to *Montana*.

### i.   First *Montana* Exception

*Montana*'s consensual relationship exception recognizes that tribes have jurisdiction to regulate consensual relations "through taxation, licensing, or other means." 450 U.S. at 565. Courts have recognized that tort law, under which the Tribe's claims against Knighton arise, constitutes a form of regulation. *See Attorney's Process*, 609 F.3d at 938 (stating that if a tribe retains the power under *Montana* to regulate nonmember conduct, it does not make any difference whether it does so through precisely tailored regulations or through tort claims). However, *Montana*'s consensual relationship exception requires that "the regulation imposed by the Indian tribe have a nexus to the consensual relationship itself." *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 656 (2001). "A nonmember's

consensual relationship in one area thus does not trigger tribal civil authority in another." *Id.*

Examining the facts of this case, we conclude that the Tribe has regulatory authority over Knighton's conduct in this case under *Montana*'s consensual relationship exception. The conduct that the Tribe seeks to regulate through tort law arises directly out of the consensual employment relationship between the Tribe and Knighton. Moreover, given the circumstances, Knighton should have reasonably anticipated that her conduct might "trigger" tribal authority. *Water Wheel*, 642 F.3d at 818 (quoting *Plains Commerce Bank*, 554 U.S. at 338). Knighton is no stranger to the Tribe's governance and laws. She had been an employee of the Tribe for approximately sixteen years and, as Tribal Administrator, was responsible for the overall supervision and management of tribal operations and carrying out tribal projects consistent with the Tribal Constitution. The Tribal Constitution, adopted approximately two years before Knighton resigned as Tribal Administrator, specifically provided that the "jurisdiction of [the Tribe] shall extend to land now within the confines of the [Rancheria] and to such other lands as may thereafter be added thereto." We conclude that given these circumstances, Knighton should reasonably have anticipated that her conduct on tribal land would fall within the Tribe's regulatory jurisdiction.

### ii. Second *Montana* Exception

In determining whether Knighton's conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe—the second *Montana* exception, 450 U.S. at 566—we find instructive the Eighth Circuit's decision in *Attorney's Process*. In that case, API, a nonmember corporation, was hired by a tribal

government leader who refused to step down from leadership after he lost in a special tribal election. 609 F.3d at 932. Under their contract, API agreed to perform services relating to "the investigation of a takeover by dissidents at the Tribe's facility located on the Tribe's reservation lands." *Id.* As the newly elected tribal council occupied the casino and tribal government offices, approximately thirty API agents forced their way into both buildings, which were located on tribal land. *Id.* The agents were armed with batons, at least one carried a firearm, and they seized confidential information from both facilities related to the tribe's gaming operations and finances. *Id.* In addition to the wrongfully seized confidential information, the agents caused approximately $7,000 in property damage and committed various intentional torts against tribal members. *Id.* The tribe filed suit in tribal court for trespass to tribal land and chattels, misappropriation of trade secrets, and other claims. *Id.*

API argued that tort claims do not in the ordinary course threaten the political integrity, economic security, or the health or welfare of the tribe and thus the tribal court had no jurisdiction over the tribe's claims under *Montana*'s second exception. *Id.* at 937. Relying on *Plains Commerce Bank*, the court in *Attorney's Process* stated that courts "should not simply consider the abstract elements of the tribal claim at issue, but must focus on the specific nonmember conduct alleged, taking a functional view of the regulatory effect of the claim on the nonmember." *Id.* at 938. The court concluded that API's raid on the casino and government offices, leading to the claims for trespass to land, trespass to chattels, and misappropriation of tribal trade secrets, "menace[d] the 'political integrity, the economic security, [and] the health [and] welfare' of the Tribe to such a degree that it 'imperil[ed] the subsistence' of the tribal community"

and that the tribe therefore retained the inherent power under the second *Montana* exception to regulate that conduct.  *Id.* at 939 (alterations in original) (quoting *Plains Commerce Bank*, 554 U.S. at 341).

While Knighton's conduct constitutes a different type of violation, it was of long duration and had a great impact upon the Tribe, and so we conclude that the alleged harm to the Tribe caused by her conduct "'imperil[ed] the subsistence' of the tribal community." *Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1306 (9th Cir. 2013) (quoting *Plains Commerce Bank*, 554 U.S. at 341).  Among the tribe's many claims are allegations that Knighton invested the Tribe's money without appropriate authority, concealed investment documents and audit reports from the Tribe, and attempted to enter financial agreements without the appropriate authorization or waiver of tribal sovereign immunity.  The Tribe also alleges that Knighton made unreasonably risky investments that led to investment losses in excess of $1.2 million, excess transaction fees, and state and federal tax exposure, and that she breached her fiduciary duty and deceived the Tribe, causing it to pay $300,000, $150,000 above market value, for the RISE building purchase.  Finally, the Tribe alleges that when she resigned her employment with the Tribe, Knighton took all files, including files belonging to the Tribe, room furnishings, and a computer, representing to the Tribe that the property removed belonged to RISE.  We conclude that this conduct threatened the Tribe's very subsistence and that the Tribe therefore retains the inherent power under the second *Montana* exception to regulate this conduct.

## II. Adjudicatory Jurisdiction

Knighton also contends that the Tribe is seeking to exercise greater adjudicative authority over her than it was

capable of at the time of her employment. She argues that the adjudicatory authority of the Tribe is limited to the disciplinary procedures provided for in the Personnel Manual. At the time of her employment, the disciplinary actions detailed in the Personnel Manual for an employee's breach of rules and standards of conduct in the course of employment included a verbal warning, written reprimand, suspension without pay, demotion, and involuntary termination. The Personnel Manual provided that when the Tribal Administrator was the subject of disciplinary action, the Community Council directly oversaw the disciplinary and grievance procedures.

We hold that the Tribe has the power to regulate Knighton's conduct incident to its sovereign powers to exclude nonmembers from tribal land, and also, in the alternative, under both *Montana* exceptions. "[W]here tribes possess authority to regulate the activities of nonmembers, '[c]ivil jurisdiction over [disputes arising out of] such activities presumptively lies in the tribal courts.'" *Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997) (second and third alterations in original) (quoting *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18 (1987)). However, a tribe's adjudicative authority over nonmembers may not exceed its regulatory authority. *Id.*

We conclude that under the facts of this case, the Tribe's adjudicatory authority does not exceed the regulatory authority it had over Knighton's conduct during her employment under *Water Wheel*'s right-to-exclude framework. As discussed above, the Personnel Manual regulated the conduct that forms the basis of the Tribe's claims against Knighton and conferred jurisdiction over her conduct as Tribal Administrator on the Community Council. The fact that the Tribe now seeks to adjudicate these claims

in the Tribal Court does not undermine its jurisdiction over the Tribe's claims.

Likewise, examining the Tribe's adjudicative authority over Knighton's conduct under *Montana*, we return to the illuminating Eighth Circuit opinion in *Attorney's Process*. Similar to this case, in *Attorney's Process*, the tribal court system was established after the tort claims against API arose. 609 F.3d at 933. API argued that the tribe lacked jurisdiction over its claims because there were no written regulations in place at the time which prohibited the tortious conduct that API was alleged to have committed. *Id.* at 938. The court stated that "[i]f the Tribe retains the power under *Montana* to regulate such conduct, we fail to see how it makes any difference whether it does so through precisely tailored regulations or through tort claims such as those at issue [in the case]." *Id.* The court concluded that because API's intervention onto tribal land threatened the "'political integrity, the economic security, [and] the health [and] welfare' of the Tribe," the tribe had the authority to regulate and adjudicate such conduct under *Montana*, as well as incident to its sovereign right to exclude nonmembers from tribal land. *Id.* at 940 (alterations in original) (quoting *Montana*, 450 U.S. at 566).

As the court in *Attorney's Process* recognized, our task is to outline the boundaries of the inherent sovereign power retained by the Indian tribes. "Those boundaries are established by federal law, a source of law external to the tribes." *Id.* at 938 (citing *Nat'l Farmers Union*, 471 U.S. at 852). In contrast, "positive tribal law," the court stated, "is internal to the tribes." *Id.* "It is a manifestation of tribal power, and as such it does not contribute to the external limitations which concern us here. Once it is determined that

certain conduct is within the scope of a tribe's power as a matter of federal law, our inquiry is at an end." *Id.*

In the present case, the Tribe's authority to regulate Knighton's conduct derived not only from its sovereign power to exclude nonmembers from tribal lands, but also from its inherent sovereign power to regulate consensual relations with nonmembers "through taxation, licensing, or other means," and to protect the "political integrity, the economic security, [and] the health [and] welfare" of the Tribe. *Montana*, 450 U.S. at 565–66.

Once the authority to regulate nonmember conduct exists, whether from *Water Wheel* or from *Montana*, then the observation from the court in *Attorney's Process* persuades us that it makes no difference whether the Tribe adjudicates Knighton's conduct through the Personnel Manual or through tort law.

## CONCLUSION

There is no general rule as to the extent of a tribe's adjudicative jurisdiction over non-Indians on tribal land, but "it is clear that the general rule announced in *Strate*, and confirmed in *Hicks* and *Plains Commerce Bank*, that adjudicative jurisdiction is confined by the bounds of a tribe's regulatory jurisdiction" applies. *Water Wheel*, 642 F.3d at 814. Given the existence of regulatory authority, the sovereign interests at stake, and the congressional interest in promoting tribal self-government, we conclude that the Tribal Court has jurisdiction over the Tribe's claims in this case.

**AFFIRMED.**